1

2

3

4

5

6

7

8

# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GRACE NAVARRO, et al., | Case No. 1:24-cv-00288-JLT-SAB |
| Plaintiffs, | **FINDINGS AND RECOMMENDATIONS RECOMMENDING GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS** |
| v. | |
| WALMART, INC., | (ECF No. 49) |
| Defendant. | **OBJECTIONS DUE WITHIN FOURTEEN DAYS** |

Pending before the Court is Defendant Walmart Inc.'s ("Walmart") motion to dismiss. On July 9, 2025, the Court held a hearing on the matter. Trenton Kashima, Esq., appeared for Plaintiffs. Keri Borders, Esq., appeared for Walmart. Having considered the moving papers and arguments by counsel, as well as the Court's file, the Court issues the following findings and recommendations recommending granting in party and denying in part Walmart's motion to dismiss.

## I.

## REGULATORY BACKGROUND

This is a consumer fraud, consolidated class action regarding alleged economic harms caused by the sale of Walmart's benzol peroxide ("BPO") acne treatment drug products to

Plaintiffs.[1]  (ECF No. 43, ¶ 1.)  Federal regulations require manufactures to test their products, including stability testing, to prevent benzene contamination and BPO degradation, ensuring that a BPO product's active ingredient does not prematurely degrade into benzene.  (Id. at ¶ 2.) Benzene is restricted by the Food and Drug Administration ("FDA") to 2 ppm where its use in manufacturing is "unavoidable" in order to produce a drug product with a significant therapeutic advance.  (Id. at ¶ 3.)

Under federal law, pharmaceutical drugs must be manufactured in accordance with current Good Manufacturing Practices ("cGMPs") to ensure they meet safety, quality, purity, identity, and strength standards.  See 21 U.S.C. § 351(a)(2)(B); (see also ECF No. 43, ¶ 54.) Entities at all phases of the design, manufacture, and distribution chain are bound by these requirements.  (ECF No. 43, ¶ 93.)  The cGMP regulations require over the counter ("OTC") drug products meet safety, quality, purity, identity, and strength standards.  See 21 U.S.C. § 351(a)(2)(B)  The cGMPs

> establish minimum current good manufacturing practice for methods to be used in, and the facilities or controls to be used for, the manufacture, processing, packing, or holding of a drug to assure that such drug meets the requirements of the act as to safety, and has the identity and strength and meets the quality and purity characteristics that it purports or is represented to possess.

21 C.F.R. § 210.1(a).

In addition, Plaintiffs allege that state and U.S. territorial drug regulation laws impose an independent duty on drug manufacturers to ensure that end purchasers receive drugs that are made in accordance with cGMPs.  (Id. at ¶ 94.)  This duty emanates from each state's adoption or adherence to federal cGMP and adulteration standards.  (Id. at ¶¶ 94, 96.)[2]

---

[1] Plaintiffs are Grace Navarro (California), Chatham Mullins (Massachusetts), Christopher Emery (Missouri), Anthony Ryan (Missouri), Skylar Williams (Illinois), Jared J. Smith (Nevada), Kelli Hunt (Missouri), Lindsey Smith (Washington State), April Diggins (Pennsylvania), Ramon Soto (Illinois), Kathlyn Averitt (Illinois), Scott Linman (Arizona), Dawn Martin (Nevada), Brett A. Gooden (Illinois), Erica L. Millbank (Washington State), Stephanie Welch (Washington State), Kristin Davis (Pennsylvania), Kara Philbrick (Connecticut), Alexandra Donato (Pennsylvania), Nicole Araujo (Connecticut), Dean P. Damico (Nevada), Tiffany Richmond (Ohio), Jennifer Harper (Missouri), Lorrie Potter (Ohio), Jessica Farias (Maryland), Nanea Tannehill (Hawaii), Alicia M. Baldwin (Illinois), Jennifer Irizarry (Maryland), Theresa Dean (Illinois), Charlene Dotson Orange (Missouri), Jasmine N. Cooper (Ohio), Dawin Timmons (Illinois), and Kendralanne Stafford (Illinois).  (ECF No. 43, ¶¶ 10-41.)

[2] Plaintiffs specifically cite to: Alabama Code §§ 20-1-24 and -27(1); Alaska Statutes § 17.20.290(a)(1); Arizona Statutes § 32-1965(1), (2) and -1966(3); Arkansas Code § 20-56-215(1); California Health and Safety Code §§

Plaintiffs assert that "[d]rug manufacturers bear responsibility for the content of their labels at all times." (<u>Id.</u> at ¶ 95.) Any drug product not manufactured in accordance with cGMPs is deemed "adulterated" or "misbranded" and may not be distributed or sold in the United States. (<u>Id.</u> at ¶ 96, quoting 21 U.S.C. §§ 331(a), 351(a)(2)(B).)

In 2010, the FDA issued a "final rule to include benzoyl peroxide as a generally recognized as safe and effective (GRASE) active ingredient in over-the-counter (OTC) topical drug products," known as a "monograph." (<u>Id.</u> at ¶ 97, quoting 75 FR 9776, OTC Monograph M006 (Part 333, subpart D, Topical Acne Drug Products for OTC Human Use).) An OTC drug monograph establishes conditions, such as active ingredients, uses (indications), doses, routes of administration, labeling, and testing, under which an OTC drug in a given therapeutic category (*e.g.*, sunscreen, antacid, acne product) is generally recognized as safe and effective for its intended use. <u>See</u> Topical Acne Drug Products for Over-the-Counter Human Use; Final Monograph, 56 FR 41008-01, 1991 WL 156981. "Any product which fails to conform to an applicable monograph after its effective date is liable to regulatory action." 21 C.F.R. § 330.10(b); (ECF No. 43, ¶ 98.) In other words, once a final monograph goes into effect, it is illegal to sell a drug that no longer conforms to "each of the conditions contained in this part [330.1] and in an applicable monograph[.]" 21 C.F.R. § 330.1; (ECF No. 43, ¶ 99.). The "conditions contained in this part" include a requirement that "(a) [t]he product is manufactured in compliance with current good manufacturing practices, as established by parts 210 and 211 of this chapter." 21 C.F.R. § 330.1(a); (ECF No. 43, ¶ 99.). In turn, parts 210 and 211 describe the cGMPs described above.

---

111260; Colorado Statutes §§ 25-5-403(1)(a),(b) and -414(1)(c); Title 16, Delaware Code §§ 3302 and 3303(2); District of Columbia Code § 48-702(2); Florida Statutes §§ 499.005(1) and .006(3); Georgia Code § 26-3-3(1); Guam Statutes 10 G.C.A. § 40114; Hawaii Revised Statutes §§ 328-6(1) and -14(1)(B)(ii); Idaho Code § 37-115(a); Iowa Code §§ 126.3(1) and .9(1)(c); Chapter 410, Illinois Statutes §§ 620/3.1 and /14(a)(2)(B); Kentucky Statutes § 217.175(1); Maryland Code, Health–General §§ 21-216(c)(5)(2) and -256(1); Massachusetts General Laws chapter 94 §§ 186 and 190; Minnesota Statutes §§ 151.34(1) and .35(1); Missouri Statutes § 196.015(1); Montana Code §§ § 50-31-305(3) and -501(1); Nebraska Revised Statutes §§ 71-2461(2) and -2481; Nevada Statutes § 585.520(1); New Hampshire Revised Statutes §§ 146:1(I) and :4(V); New Mexico Statutes §§ 26-1-3(A) and -10(A); New York Education Law § 6811; North Dakota Century Code §§ 19-02.1-02(1) and .1-13(3); Ohio Code § 3715.52(A)(1); Oklahoma Statutes title 63 § 1-1402(a); Title 35, Pennsylvania Statutes § 780-113(a)(1); Title 21, Rhode Island General Laws § 21-3-3(1); South Carolina Code §§ 39-23-30(a)(2)(B) and -80(A)(1); South Dakota Code §§ 39-15-3 and -10; Title 18, Vermont Statutes § 4052(1); Virginia Code § 54.1-3457(1); West Virginia Code §§ 16-7-1 and -2(a)(3); and Wyoming Statutes §§ 35-7-111(a)(i)–(iv), (vi) and -116. (ECF No. 43, ¶ 94.)

The cGMPs identified in part 210 "contain the minimum current good manufacturing practices for methods to be used in, and the facilities or controls to be use for, the manufacture, processing, packaging, or holding of a drug to assure that such drug meets the requirements of the act as to safety, and . . . meets the quality and purity characteristics that it purports or is represented to possess." (Id. at ¶ 100, quoting 21 U.S.C. Part 210.1(a).)  The "manufacture, processing, packaging, or holding of a drug product includes packaging and labeling operations, testing, and quality control of drug products."  (Id. at ¶ 101, quoting 21 U.S.C. 210.3(12).)  "The failure to comply with any regulation set forth in this part [210] . . . in the manufacture, processing, packaging, or holding of a drug shall render such drug to be adulterated under section 501(a)(2)(B) of the act [FDCA 21 U.S.C. 301 et seq.] and such drug, as well as the person who is responsible for the failure to comply, shall be subject to regulatory action."  (Id. at ¶ 102, quoting 21 U.S.C. Part 210.1(b).)

For example, the regulations include that drug product manufacturers have "written procedures" for production and process control designed to comply with cGMPs.  21 C.F.R. § 211.100.  A drug product manufacturer's "[l]aboratory controls shall include the establishment of scientifically sound and appropriate specifications, standards, sampling plans, and test procedures designed to assure that components, drug product containers, closures, in-process materials, labeling, and drug products conform to appropriate standards of identity, strength, quality, and purity."  21 C.F.R. § 211.160.  "Laboratory records shall include complete data derived from all tests necessary to assure compliance with established specifications and standards, including examinations and assays" and a "statement of the results of tests and how the results compare with established standards of identity, strength, quality, and purity for the component, drug product container, closure, in-process material, or drug product tested."  21 C.F.R. § 211.194(a)(6).  Should a drug not be manufactured in accordance with cGMPs, the drugs will be considered "adulterated" or "misbranded" and may not be distributed or sold in the United States.  21 U.S.C. §§ 331(a), 351(a)(2)(B); (see ECF No. 43, ¶¶ 103(a)-(w), 111, 112.)

A drug may be adulterated under federal and applicable state laws if:

it consists in whole or in part of any filthy, putrid, or decomposed

substance; or

it has been produced, prepared, packed, or held under insanitary conditions whereby it may have been contaminated with filth, or whereby it may have been rendered injurious to health; or

its purity or quality falls below that which it purports or is represented to possess; or

any substance has been mixed or packed with it so as to reduce its quality or strength.

(Id. at ¶ 113, quoting 21 U.S.C. § 351(a)(2)(B), 21 U.S.C. § 351(a)(1), 21 U.S.C. § 351(b), Cal. Health & Safety Code § 111290, and other state analogs).  A drug may be misbranded under federal and applicable state laws:

If its labeling is false or misleading in any particular; or

It is dangerous to health under the conditions of use prescribed in the labeling or advertising thereof; or

the manufacturer, distributor or seller engages in the dissemination of any false advertisement.

(Id. at ¶ 114, quoting 21 U.S.C. § 352(a)(1), 21 U.S.C. § 352(j), Cal. Health & Safety Code § 110390, and other state analogs).

## II.

## BENZENE, BENZOL PEROXIDE, AND BPO PRODUCT BACKGROUND

Benzene is used primarily as a solvent in chemical and pharmaceutical industries, as a starting material and intermediate in the synthesis of numerous chemicals and in gasoline.  (Id. at ¶ 58.)  The major United States source of benzene is petroleum.  (Id. at ¶ 58.)  Benzene is a well-known human carcinogen that is not permitted to be used in pharmaceutical products unless absolutely avoidable.  (Id. at ¶ 2.)  There is no safe level of benzene exposure, and even in trace amounts, benzene is known to pose a health risk from exposure routes that include inhalation, ingestion, dermal absorption, and skin or eye contact.  (Id. at ¶¶ 2, 70.)  The health hazards of benzene have been recognized for over one hundred years, and the scientific and regulatory communities agree that benzene is a known human carcinogen with severe consequences to human exposure.  (Id. at ¶ 59.)  The World Health Organization ("WHO") recognizes that, "[h]uman exposure to benzene has been associated with a range of acute and long-term adverse

health effects and diseases, including cancer and hematological effects." (Id. at ¶ 59.)  WHO specifically outlines that benzene is a genotoxic carcinogen in humans and no safe level of exposure can be recommended. (Id. at ¶ 59.)

The Centers for Disease Control and Prevention conducted a toxicity assessment, which demonstrated that benzene may harm the central nervous system and may affect reproductive organs. (Id. at ¶ 60; see id. at ¶ 61.)  In addition, the FDA has recognized that benzene is a carcinogen that can cause cancer in human and classifies it as a "Class 1" solvent that should be avoided in drug manufacturing. (Id. at ¶¶ 65, 89.)  Only if unavoidable may a drug product contain 2 ppm of benzene. (Id. at ¶¶ 65, 89, 105.)  Plaintiffs assert that the FDA considers benzene contamination above 2 ppm to render a drug adulterated. (Id. at ¶ 65; see also id. at ¶¶ 66-68.)  Other national and international organizations have come to similar conclusions, including the National Cancer Institute, the National Toxicology Program, and the International Agency for Research on Cancer. (Id. at ¶¶ 62-64.)

BPO degrades to benzene when exposed to high heat over time, a process that was first reported in scientific literature as early as 1936 and has been acted upon in industries other than the acne treatment product industry. (Id. at ¶¶ 121, 122; see id. at ¶¶ 123-26, 129.)  Even short periods in higher temperatures can lead to increased benzene contamination. (Id. at ¶ 127.)

BPO products are "drugs" used to treat acne (i.e., acne vulgaris), formulated with BPO, along with other inactive ingredients, to make acne treatment creams, washes, scrubs, and bars. (Id. at ¶ 88.)  Before being sold to the public, BPO products must be made in conformity with current good manufacturing practices and must conform to quality, safety, and purity specifications. (Id. at ¶ 88.)  Under the FDCA, a drug is adulterated "if it is a drug and the methods used in, or the facilities or controls used for, its manufacture, processing, packaging, or holding do not confirm to or are not operated or administered in conformity with current good manufacturing practice. . . ." (Id. at ¶ 88, quoting 21 U.S.C. § 351(a)(2)(B).)

BPO Products are not designed to contain benzene, and no amount of benzene is acceptable in acne treatment products such as the BPO products manufactured, distributed, and sold by Walmart. (Id. at ¶ 86.)  Plaintiffs alleges that Walmart failed to disclose on the BPO

products' labeling or anywhere in its marketing that the BPO products contain benzene or that the products can degrade to form benzene."  (Id. at ¶ 86.)

Plaintiffs allege that the topical application of BPO products specifically increases the absorption rate of benzene through the skin, thereby increasing the risk of harm.  (Id. at ¶ 71.) "Direct exposure of the eyes, skin, or lungs to benzene can cause tissue injury and irritation." (Id. at ¶ 71.)  Accordingly, Plaintiffs observe that the National Institute for Occupational Safety and Health ("NIOSH") recommends protective equipment be worn by workers exposed or expecting to be exposed to benzene at concentrations of 0.1 ppm and defines "inhalation, skin absorption, ingestion, skin and/or eye contact" as exposure routes or paths.  (Id. at ¶ 71.)

In December 2023, the FDA published guidance on its website in the form of an "Alert," stating: "Drug manufacturers with a risk for benzene contamination should test their drugs accordingly and should not release any drug product batch that contains benzene above 2 ppm[.] . . .  If any drug product batches with benzene above 2 ppm are already in distribution, the manufacturer should contact FDA to discuss the voluntary initiation of a recall[.]"  (Id. at ¶¶ 69; 90, 91.)  The FDA specifically recognized that benzene contamination in drugs can result from certain ingredients that "may yield benzene under certain conditions" and that the "formation of benzene from benzoate can lead to an increase in benzene content over a drug's shelf-life' and should be considered when determining the appropriate timing for benzene testing, e.g., testing at release and on stability (21 CFR 211.165, 211.166), and establishment of an appropriate expiration date (21 CFR 211.137)."  (Id. at ¶¶ 69, 90, 91.)

Relatedly, the Environmental Protection Agency ("EPA") also recognizes that benzene is a known carcinogen for all routes of exposure.  (Id. at ¶ 72.)  The EPA has set 0.0005 ppm as the maximum permissible level of benzene in drinking water, with a stated goal of "zero."  (Id. at ¶ 73.)

Valisure LLC ("Valisure") is an analytical laboratory and online pharmacy that tests medications and healthcare products to ensure their safety, quality, and consistency. (Id. at ¶ 77.) Valisure is accredited by the International Organization for Standardization ("ISO/IEC") 17025:2017 standards for chemical testing (PJLA Accreditation Number 94238) and is registered

1  with the Drug Enforcement Administration (License # RV0484814).  (Id.)  On March 5, 2024,

2  Valisure filed a citizen petition with Federal Food and Drug Administration, requesting a recall

3  and suspension of sales of BPO from the U.S. market.  (Id. at ¶ 76.)³  In layman's terms, Valisure

4  reported that it had tested and detected high levels of benzene in specific batches of BPO

5  products, including the Walmart's Equate® Beauty Acne Wash 10% BPO cream.  (Id. at ¶ 81.)

6  More specifically, Valisure stated that "current evidence suggests that on-market BPO products

7  could produce substantial amounts of benzene when stored at above-ambient temperatures,

8  specifically 37°C (98.6°F), 50°C (122°F) and 70°C (158°F)."  (Valisure Petition, p. 1; see ECF

9  No. 43, ¶¶ 81, 82.)  Moreover, Valisure also detected the substantial production of benzene

10  "emanating externally into the air surrounding an unopened benzol peroxide product," which

11  implicates possible inhalation exposure.  (Id. at p. 3.)  Valisure observed that the problem with

12  benzene in BPO products is seemingly due to the "inherent instability of the benzol peroxide

13  molecule that breaks down and forms benzene."  (Id. at p. 8) (emphasis omitted).

14      The citizen petition acknowledged the most recent guidance from the FDA, which in

15  2011 determined that "that benzoyl peroxide [2.5% to 10%] can be adequately labeled to

16  minimize risks while delivering effective acne treatment."  (Id. at p. 3.)  Meanwhile prescription-

17  strength BPO products require a warning that: "[t]he role of benzoyl peroxide as a tumor

18  promoter has been well established in several animal species.  However, the significance of this

19  finding in humans is unknown."  (Id.)

20      Valisure tested 99 different BPO products, both prescription and OTC, including at least

21  one product from Walmart, incubating the products at 122 degrees Fahrenheit for 18 days.  (Id.

22

23  ³Valisure   Petition,   available   at   https://assets-global.websitefiles.com/6215052733f8bb8fea016220/
    65e8560962ed23f744902a7b_Valisure%20Citizen%20Petition%20on%20Benzene%20in%20Benzoyl%20Peroxide
24  %20Drug%20Products.pdf  Plaintiffs have unambiguously incorporated Valisure's citizen petition into the first
    amended complaint.  (ECF No. 43, ¶¶ 76-87.)  "Even if a document is not attached to a complaint, it may be
25  incorporated by reference into a complaint if the plaintiff refers extensively to the document or the document forms
    the basis of the plaintiff's claim."  United States v. Ritchie, 342 F.3d 903, 908 (9th Cir. 2003).  "If the documents are
26  not physically attached to the complaint, they may be considered if the documents' authenticity is not contested and
    the plaintiff's complaint necessarily relies on them."  Lee v. City of Los Angeles, 250 F.3d 668, 688 (9th Cir. 2001)
27  (cleaned up).  Because the citizen petition is a filing with a government agency, and because Plaintiffs' claims
    necessarily rely on the findings detailed therein, the Court incorporates the citizen petition into the first amended
28  complaint.  In light of this, the Court will, where appropriate, cite to the citizen petition for precision of language,
    herein after "Valisure Petition."

at pp. 15-18).   Results demonstrated that there was a "substantial instability of BPO and its propensity to form concerningly high levels of benzene in only 18 days." (Id. at p. 18; see ECF No. 43, ¶ 81.)   Valisure noted that 122 degrees Fahrenheit is a reasonable temperature to test because it is a temperature the products may be exposed to during distribution and because it is an "accepted incubation temperature" used in the pharmaceutical industry.  (Id. at pp. 17-18.)[4] In addition, Valisure stated that it observed evidence that BPO product packaging may be porous to benzene, enabling some of the benzene "to escape into the environment or air around the package."  (Id. at p. 22).  Results from this 50° C stability testing showed that the Equate® Beauty Acne Wash 10% BPO cream contained some level of benzene ranging from a maximum of 2,000 ppm to 1.8 ppm.  (ECF No. 43 ¶¶ 81, 84.)

Valisure offered a possible future remedy to address BPO instability, suggesting the creation of reformulations of BPO-containing acre treatment products.  (Valisure Petition, p. 25; see ECF No. 43, ¶ 128.)  Nonetheless, the citizen petition seeks, among other relief, "to have the Commissioner and FDA request recalls and a suspension of sales for products containing the active pharmaceutical ingredient benzoyl peroxide, consistent with FDA's mandate to ensure the safety of prescription and over the counter the drugs in the United States."  (Id. at p. 29).

Plaintiffs assert that they conducted independent testing on "BPO Products purchased by Plaintiffs' counsel [that] similarly shows benzene levels significantly above the FDA's recall threshold of 2 ppm.  For example, testing conducted on three (3) of Defendant's Equate Acne Treatment Gel 10% BPO Products purchased in or around May 2024 showed benzene levels of 592.46 ppm (Lot # 0614742), 561.17 ppm (Lot # 0606804), and 626.66 ppm (Lot # 0605012), respectively."  (Id. at ¶ 85.)

### III.

### FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs in this action are 32 individuals from Arizona, Connecticut, Hawaii, Illinois, Maryland, Massachusetts, Missouri, Nevada, Ohio, Pennsylvania, and Washington State. (ECF

---

[4] Similar findings were made when Valisure tested certain products, incubating them at 158 degrees Fahrenheit. (Valisure Petition, pp. 19-21).

No. 43, ¶¶ 10-41.)  Each Plaintiff alleges that they bought a Walmart "Equate Beauty" acne product that contained BPO.  (Id.)  These include the Equate® Beauty Acne Foaming Cleanser 10% BPO, Equate® Beauty Maximum Strength Acne Wash 10% BPO, Equate® Beauty Acne Treatment Gel 10% BPO, Equate® Beauty Daily Acne Control Cleanser Cream 10% BPO, Equate® Beauty Purifying Cleanser 2.5% BPO, and Equate® Beauty Repairing Lotion 2.5% BPO.  (Id.)  Essentially, each Plaintiff reviewed Walmart's BPO products' accompanying labels and disclosures, and they understood them as representations and warranties by the manufacturer that BPO products were properly manufactured, free from defects, safe for their intended use, and not adulterated or misbranded.  (Id.; see id. at ¶ 146)  With this understanding, Plaintiffs each made the decision to purchase the BPO products.  (Id.)  Plaintiffs offer that "the BPO Products sold during the applicable class period failed to conform to the final monograph after its effective date because the Products (1) contain benzene and/or degrade to form benzene at excessive levels and/or (2) are adulterated and misbranded and, thus, illegal to sell, in violation of 21 C.F.R. § 330.10(b)."  (Id. at ¶¶ 110, 116, 137.)  Furthermore, Plaintiffs allege that Walmart did not disclose to Plaintiffs in "in any advertising or marketing that its BPO Products contained or would degrade into benzene."  (Id. at ¶ 120.)  Because of the potential adulteration of the BPO products by benzene, the products were worthless.  (Id. at ¶¶ 116, 146.)  Had Plaintiffs known that the BPO products were not, in fact, properly manufactured, free from defects, safe for their intended use, or adulterated, misbranded, or illegal to sell, Plaintiffs would not have purchased the BPO products or used the products at all or would have paid significantly less for them.  (Id.; see id. at ¶¶ 6-9, 137, 140-46.)

Defendant is Walmart, a Delaware corporation with its principal place of business in Bentonville, Arkansas.  (Id. at ¶ 44.)  Walmart markets itself as a merchandiser of quality acne treatment products and employs high-level scientists, chemists, and researchers to formulate and/or decide which drug products to label and sell for public use.  (Id. at ¶ 130.)  Walmart manufactures, markets, distributes, and sells various skin care products, including Equate® Beauty Acne Foaming Cleanser 10% PBO, and Equate® Beauty Daily Acne Control Cleanser Cream 10% BPO, Equate® Beauty Purifying Cleanser 2.5% BPO, and Equate® Beauty

Repairing Lotion 2.5%. (<u>Id.</u> at ¶¶ 45, 51.) Walmart's Equate® BPO products are sold on Walmart's website, third-party websites, as well as sold by various retailers including Walmart, Walgreens, and Costco both online and in-store throughout the United States. (<u>Id.</u> at ¶ 45.) Plaintiffs allege that all of Walmart's BPO products are manufactured in the same manner during the relevant time period and had the same material information on their labels. (<u>Id.</u> at ¶ 55.) According to Plaintiffs, Walmart authorized the false, misleading, and deceptive marketing, advertising, distribution, and sale of its BPO products. (<u>Id.</u> at ¶ 45.) Plaintiffs assert that Walmart's BPO products are marketed as safe and effective OTC acne treatment. (<u>Id.</u> at ¶ 52.) However, Plaintiffs allege that Walmart's BPO products degrade into benzene making the products illegal to sell. (<u>Id.</u> at ¶¶ 52, 56, 57.) Given the marketing as OTC drugs, Plaintiffs reasonably assumed that the BPO products met minimum federal safety criteria and were manufactured in compliance with FDA requirements, as well as in compliance with minimum standards established in the industry and were therefore fit for the ordinary purpose for which such goods are used. (<u>Id.</u> at ¶ 52.)

Plaintiffs allege that Walmart had a duty to ensure that it complies with cGMPs and that its products meet minimum safety standards. (<u>Id.</u> at ¶¶ 53, 119.) Moreover, Plaintiffs allege that Walmart was aware of the established chemical processes that causes BPO to degrade into benzene when exposed to high temperatures or in other conditions. (<u>Id.</u> at ¶ 130.) Plaintiffs allege that though Walmart's BPO products should not have become adulterated with benzene, there was benzene above 2 ppm in the BPO products. (<u>Id.</u> at ¶ 104.) "Had the manufacturing inputs, manufacturing, and holding process been conducted within acceptable temperatures, as required by the cGMP regulations cited above, it is unlikely that any benzene would be present in the [BPO p]roducts." (<u>Id.</u> at ¶ 104.) "Plaintiffs believe that it was the manufacturing and holding of the [BPO p]roducts at unacceptable temperatures that causes the benzene contamination and/or any instability in the Products. Additionally, had the benzene contamination been from improper inputs, failure to clean, maintain, and sanitize equipment, or failure to establish control manufacturing and holding procedures, it still would be a violation of the cGMP." (<u>Id.</u> at ¶ 104.)

11

Plaintiffs allege that Walmart knew or should have been aware that its BPO products were adulterated with benzene because Walmart was required to do stability testing to understand the "shelf life" of the products. (Id. at ¶¶ 5, 106, 109, 131.) Plaintiffs assert that stability testing found that Walmart's BPO products contained unacceptable amounts of benzene, which "is an additional violation of the cGMP." (Id. at ¶ 106; see id. at ¶¶ 132, 133, 138.) Thus, Plaintiffs allege that "[Walmart's] BPO Products did not conform to its final monograph specifications after its effective date, in violation of 21 C.F.R. § 330.10(b), which demonstrates inadequate production, process, and quality oversight by [Walmart]." (Id. at ¶ 107.) Notwithstanding, Walmart "falsely labeled and marketed its illegal [BPO p]roducts as compliant with state and FDCA drug regulations," and it continues to do so. (Id. at ¶ 108, 134.) Plaintiffs allege that Walmart could have avoided any potential for benzene contamination in the BPO products by changing the manufacturing process or raw ingredients, and the BPO products could have been sold with absolutely no benzene in them. (Id. at ¶¶ 4, 115.)[5]

On March 8, 2024, Plaintiffs Grace Navarro and Chatham Mullins commenced this action. (ECF No. 1.) Following litigation not relevant here, on March 13, 2025, the operative complaint was filed by all Plaintiffs (ECF No. 43), bringing the following claims against Walmart:

> 1) violations of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, et seq.;
>
> 2) violation of California's Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750, et seq.;
>
> 3) false advertising under the laws of California, Hawaii, and New York;
>
> 4) deceptive trade practices under the law of California, Connecticut, Florida, Hawaii, Illinois, Maryland, Massachusetts, Michigan,

---

[5] Specifically, Plaintiffs allege that "BPO as a raw material is known to be thermally stable at purities as high as 75% up to temperatures of 98°C.63 Valisure also evaluated pure BPO reference powder in its GC-MS analytical system and found no evidence of the instability and formation of benzene seen in formulated final products of BPO containing acne treatments." (ECF No. 43, ¶ 115.) Thus, if BPO is inherently stable as a pure, crystalline powder, a reformulated product that focuses on substantially reducing or entirely preventing the degradation of BPO into benzene could, according to Plaintiffs, potentially be developed. (Id.)

Minnesota, Missouri, Nevada, New Jersey, New York, Ohio, Pennsylvania, Rhode Island, and Washington State;

    5) breach of implied warranty of merchantability under the laws of California, Hawaii, Maryland, Massachusetts, Michigan, Minnesota, Missouri, Nevada, New Jersey, Pennsylvania, and Rhode Island;

    6) negligent misrepresentation/omission under the laws of California, Connecticut, Florida, Hawaii, Illinois, Maryland, Massachusetts, Michigan, Minnesota, Missouri, Nevada, New Jersey, New York, Ohio, Pennsylvania, Rhode Island, and Washington State; and

    7) unjust enrichment/quasi-contract under the laws of California, Connecticut, Florida, Hawaii, Illinois, Maryland, Massachusetts, Michigan, Minnesota, Missouri, Nevada, New Jersey, New York, Ohio, Pennsylvania, Rhode Island, and Washington State;

(Id. at ¶¶ 159-266.)  For relief, Plaintiffs pray for an order certifying a proposed class; equitable relief; declaratory relief; restitution and/or damages; disgorgement; statutory damages; and attorney's fees and costs.  (Id. at pp. 67-68.)

On April 28, 2025, Walmart moved to dismiss the action for lack of standing and failure to state a claim, and the district judge referred the motion to the undersigned for the preparation of findings and recommendations.  (ECF Nos. 49, 50.)  The motion has been fully briefed (ECF Nos. 53, 54), and on July 9, 2025, the Court held a hearing on the matter.  (ECF No. 55.)

**IV.**

**LEGAL STANDARDS**

Under Federal Rule of Civil Procedure 12(b)(1), a complaint must be dismissed if a plaintiff lacks Article III standing to bring suit.  Maya v. Centex Corp., 658 F.3d 1060, 1067 (9th Cir. 2011).  The standing doctrine is derived from limitation of Article III on the judicial power of federal courts to hear only "actual cases or controversies."  Spokeo, Inc. v. Robins, 578 U.S. 330, 337 (2016) (internal quotation marks omitted).  "The doctrine limits the category of litigants

empowered to maintain a lawsuit in federal court to seek redress for a legal wrong." Id. at 338. Standing "is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." TransUnion LLC v. Ramirez, 594 U.S. 413, 431 (2021). "The irreducible constitutional minimum of standing consists of three elements. The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, 578 U.S. at 338 (cleaned up), quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992). A plaintiff must show that the injury was "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." Lujan, 504 U.S. at 560 (internal quotation marks omitted).

The party invoking federal jurisdiction bears the burden of demonstrating standing. TransUnion, 594 U.S. at 430-31. A jurisdictional challenge under Rule 12(b)(1) may be facial or factual. Safe Air for Everyone v. Meyer, 373 F.3d 1035, 1039 (9th Cir. 2004). A facial challenge "asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction." Id. The "'general rule' for Rule 12(b)(1) motions challenging subject-matter jurisdiction is to take allegations 'as true unless denied or controverted by the movant.'" Federal Bureau of Investigation v. Fikre, 601 U.S. 234, 237 n.1 (2024), quoting 5C C. Wright & A. Miller, Federal Practice and Procedure § 1363, p. 107 (3d ed. 2004). A factual challenge "disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." Safe Air for Everyone, 373 F.3d at 1039. Generally, in resolving a factual attack, "the district court may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment" and "need not presume the truthfulness of the plaintiff's allegations." Id. (citations omitted). However, the Ninth Circuit recently clarified that "when jurisdictional issues are 'intertwined with an element of the merits of the plaintiff's claim,' the court must treat the motion like a motion for summary judgment and 'leave the resolution of material factual disputes to the trier of fact.'" Bowen v. Energizer Holdings, Inc., 118 F.4th 1134, 1143 (9th Cir. 2024), quoting Leite v. Crane Co., 749 F.3d 1117, 1122 (9th Cir. 2014).

Additionally, Federal Rule of Civil Procedure 8(a)(2) requires a complaint to include "a short and plain statement of the claim showing that the pleader is entitled to relief." A complaint that fails to meet this standard may be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6). To overcome a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009), quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. "Plausibility requires pleading facts, as opposed to conclusory allegations or the formulaic recitation of the elements of a cause of action, and must rise above the mere conceivability or possibility of unlawful conduct that entitles the pleader to relief." Somers v. Apple, Inc., 729 F.3d 953, 959-60 (9th Cir. 2013) (cleaned up). "Factual allegations must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555.

In ruling on a Rule 12(b)(6) motion, the court "accept[s] all factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." Rowe v. Educ. Credit Mgmt. Corp., 559 F.3d 1028, 1029-30 (9th Cir. 2009) (citation omitted). But "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences" need not be accepted. In re Gilead Scis. Sec. Litig., 536 F.3d 1049, 1055 (9th Cir. 2008) (citation omitted). "Dismissal is appropriate when the complaint lacks a cognizable legal theory or sufficient factual allegations to support a cognizable legal theory." Saloojas, Inc. v. Aetna Health of Cal., Inc., 80 F.4th 1011, 1014 (9th Cir. 2023) (cleaned up).

## V.

## DISCUSSION AND ANALYSIS

In its motion to dismiss, Walmart begins by arguing that the operative complaint should be dismissed because Plaintiffs' claims are preempted by federal law, both expressly and impliedly. (ECF No. 49-1, pp. 16-22.) Walmart then argues that even if certain claims are not preempted, they fail the Rule 8 pleading standard. (Id. at pp. 22-25.) Moreover, Walmart contends that Plaintiffs lack Article III standing as well as standing to pursue injunctive relief.

1    (Id. at pp. 25-28.)  Walmart then attacks Plaintiffs' claim individually, arguing that they fail to

2    state a claim for various reasons.  (Id. at pp. 28-33.)

3           Plaintiffs oppose, arguing that their claims are neither expressly nor impliedly preempted.

4    (ECF No. 53, pp. 11-19.)  Plaintiffs then explain how they believe their claims meet federal

5    pleading requirements.  (Id. at pp. 19-21.)  Plaintiffs then rebut Walmart's standing arguments.

6    (Id. at pp. 21-25.)  Finally, Plaintiffs respond in turn to Walmart's final arguments.  (Id. at pp.

7    25-34.)

8           The Court first addresses the threshold issue of standing before turning to Walmart's

9    other arguments.

10          A.      Standing.

11          The Court begins by observing that Walmart's attack on subject-matter jurisdiction is

12   facial—i.e., Walmart attacks the allegations in the complaint as well as the incorporated citizen

13   petition from Valisure.  See Safe Air for Everyone, 373 F.3d at 1039.  Walmart contends that

14   Plaintiffs have failed to allege an injury-in-fact because the complaint does not contain facts that

15   plausibly demonstrate that their BPO products contained benzene and were actually unsafe, and

16   therefore, Plaintiffs have failed to plead an injury-in-fact, as required for Article III standing.

17   (ECF No. 49-1, pp. 25-27.)

18          However, as also recognized in at least three other district court opinions, the Ninth

19   Circuit's recent decision in Bowen v. Engergizer Holdings, Inc., 118 F.4th 1134 (9th Cir. 2024),

20   dispenses with Walmart's standing argument.  Daugherty v. Padagis, US LLC, 794 F. Supp. 3d

21   674, 687 (N.D. Cal. 2025); Ottesen v. Hi-Tech Pharmaceuticals, Inc., No. 19-cv-07271-JST,

22   2024 WL 5205539, at *8 (N.D. Cal. Dec. 23, 2024); Bonthon v. Procter & Gamble Company,

23   No. 23-cv-00765-AMO, 2024 WL 4495501, at *7 (N.D. Cal. Oct. 15, 2024); see Howard v.

24   Alchemee, LLC, Nos. 2:24-cv-01834-SB-BFM; 2:24-cv-01876-SB-BFM; 2:24-cv-01878-SB-

25   BFM, 2024 WL 4272931, at *2-*5 (C.D. Cal. Sept. 19, 2024); see also Eisman v. Johnson &

26   Johnson Consumer, Inc., No. 2:24-cv-01982-ODW (AJRx), 2025 WL 241024, at *2 (C.D. Cal.

27   Jan. 17, 2025) (acknowledging the defendants' argument regarding standing but analyzing only

28   whether the plaintiff's claims were preempted).

1    In <u>Bowen</u>, the plaintiff brought a putative class action alleging that the defendants'

2 sunscreen products contained an unsafe level of benzene.  118 F.4th at 1140.  The plaintiff

3 alleged a myriad of claims, including California state law claims under the FAL, UCL, and

4 CLRA.  <u>Id.</u>  The plaintiff specifically alleged that she "would have never paid a premium for

5 sunscreen products that contained or were at risk of containing the carcinogen benzene" and that

6 she "suffered economic injury when she spent money to purchase sunscreen products she would

7 not otherwise have purchased, or [would have] paid less for, absent Defendants' misconduct

8 . . . ." <u>Id.</u> at 1141 (modification in original).  Relying on an FDA "guideline permitting 2 ppm of

9 benzene in sunscreen," the district court concluded that the plaintiff "[did] not allege facts that

10 tend to show a non-speculative increased health risk or actual economic harm" and granted the

11 defendants' motion to dismiss.  <u>Id.</u>

12    The Ninth Circuit reversed.  Reaffirming precedent, the Court observed that under a

13 theory of economic harm a plaintiff "need prove only that she 'paid more for [the product] than

14 [she] otherwise would have paid, or bought it when [she] otherwise would not have done so,'

15 <u>Hinojos v. Kohl's Corp.</u>, 718 F.3d 1098, 1104 n.3 (9th Cir. 2013), absent [the d]efendants' 'false

16 representations—or actionable non-disclosures—about [the product].'"  <u>Bowen</u>, 118 F.4th at

17 1147, quoting <u>McGee v. S-L Snacks National</u>, 982 F.3d 700, 706 (9th Cir. 2020).

18    Here, Plaintiffs allege that before purchasing Walmart' BPO products they read and

19 relied on the labeling on the products, including the Walmart name brand, when deciding to

20 make their purchases; Plaintiffs believed that the products were safe for their skin.  Plaintiffs

21 allege that the products they purchased were adulterated or misbranded because the BPO

22 degraded or could degrade into benzene.  While Plaintiffs did not have their individual products

23 tested, they allege that Valisure tested Walmart's Equate Beauty Acne Wash 10% BPO cream,

24 Equate Beauty Acne Control Cleanser Cream 10% BPO.  (ECF No. 43, ¶¶ 81, 84.)  Further,

25 Plaintiffs allege that they conducted independent testing that tested Walmart's Equate® Acne

26 Treatment Gel 10% BPO products.  (<u>Id.</u> at ¶ 85.)  Plaintiffs state that they would not have

27 purchased Walmart's BPO products if they had known that the products contained benzene or

28 could degrade into benzene.  Thus, under <u>Bowen</u>, the Court finds that Plaintiffs have sufficiently

1  alleged economic harm sufficient to confer Article III standing.  See 118 F.4th at 1146-47.[6]

2      The Court will recommend denying Walmart's motion to dismiss insofar as it seeks to

3  dismiss for lack of standing.

4      **B.    Preemption.**

5      Walmart argues that because Plaintiffs' claims seek to impose requirements for the

6  labeling and manufacturing of its BPO products, they are expressly preempted.  (ECF No. 49-1,

7  pp. 8-12.)  Then, Walmart argues that federal law impliedly preempts Plaintiffs' state-law cGMP

8  claims.  (Id. at pp. 12-14.)  Plaintiffs respond, arguing that the acne monograph incorporates the

9  FDCA's prohibition on the sale of adulterated and misbranded drugs, and therefore, their claims

10 are not expressly preempted.  (ECF No. 53, p. 2-8.)  Relying on cGMPs, Plaintiffs then assert

11 that their claims based on cGMPs are not impliedly preempted because their claims are parallel.

12 (Id. at pp. 8-10.)  While the Court finds that Plaintiffs' theories regarding labeling and

13 reformulations to be preempted, the same cannot be said for Plaintiffs' claims based on cGMPs.

14      **1.    Preemption Legal Principles.**

15      "A fundamental principle of the Constitution is that Congress has the power to preempt

16 state law."  Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 372 (2000).  Preemption

17 comes in multiple forms—express, field, and conflict preemption—but the purpose of Congress

18 is "the ultimate touchstone" for all of them.  Gilstrap v. United Air Lines, Inc., 709 F.3d 995,

19 1003 (9th Cir. 2013), quoting Cipollone v. Liggett Grp., Inc., 505 U.S. 504, 516 (1992).

20      As relevant here, to ensure uniformity in the regulation of OTC drugs like Walmart's

21 BPO products, the FDCA contains a broad express preemption provision, which provides that no

22 state "may establish or continue in effect any requirement—(1) that relates to the regulation of a

23 [nonprescription drug]; and (2) that is different from or in addition to, or that is otherwise not

---

24 [6] The Court notes that in TransUnion LLC the Supreme Court of the United States held that the Article III standing
25 requirement of injury-in-fact requires a plaintiff allege a "concrete" injury "even in the context of a statutory
   violation."  594 U.S. 413, 426 (2021), quoting Spokeo, 578 U.S. at 341.  In other words, "under Article III, an injury
26 in law is not an injury in fact."  Id. at 427.  For purposes of an injury-in-fact, the Court scrutinized Plaintiff's logic
   chain that based on the Valisure study and independent testing—that did not test the actual products Plaintiffs
27 purchased—whether it can be extrapolated that the BPO products Plaintiffs purchased even risked containing
   benzene.  Which, if there were no risk, then there would almost certainly be no economic harm.  That said, at this
   stage of the litigation, the Court accepts as true, as it must, the allegations that there was at least a potential risk that
28 Plaintiffs suffered an economic injury for purposes of the Court's standing analysis.

1    identical with, a requirement under" the FDCA.  21 U.S.C. § 379r(a).  The statute defines

2    "requirement" to include "any requirement relating to public information or any other form of

3    public communication relating to a warning of any kind for a drug."  21 U.S.C. § 379r(c)(2).

4        OTC acne drug products, including Walmart's products, are governed by a

5    comprehensive set of FDA regulations called a monograph, which includes certain labeling

6    requirements.  21 C.F.R. §§ 330.1, 330.5, 330.10; 333.350.  The acne Monograph expressly

7    permits BPO to be an active ingredient in these products in an amount from 2.5 to 10 percent.  21

8    C.F.R. § 333.310(a).  Section 333.350 provides detailed instructions for labeling covered

9    products, including specific warnings and directions that must be included for products

10   containing BPO.  21 C.F.R. § 333.350(c)(4), (d)(2).  The regulations provide that an OTC acne

11   drug product "is generally recognized as safe and effective and is not misbranded if it meets each

12   of the conditions" in the monograph and "each general condition" in 21 C.F.R. § 330.1.  Id. at

13   § 333.301.  In turn, Section 330.1 specifies that OTC drugs must meet the conditions described

14   therein and must be "labeled in compliance with chapter V" of the FDCA and "the format and

15   content requirements in § 201.66."  21 C.F.R. § 330.1(c)(1).  Chapter V of the FDCA prohibits

16   the sale of adulterated or misbranded drugs.  21 U.S.C. §§ 331(a), 351, 352.

17       Consistent with Congress's intent to promote uniform drug regulation, the preemptive

18   effect of Section 379r applies not only to state legislation or regulations but also to claims under

19   state law that would have the effect, if the defendant were liable, of imposing a requirement "at

20   variance with FDA regulations."  Carter v. Novartis Consumer Health, Inc., 582 F. Supp. 2d

21   1271, 1280-83 (C.D. Cal. 2008); see also Morgan v. Albertsons Companies, Inc., No. 22-cv-

22   02948, 2023 WL 3607275, at *4-*5 (N.D. Cal. Mar. 13, 2023).  Therefore, "state law claims

23   regarding the labeling or packaging of [OTC drugs] that are not identical to the [FDCA] are

24   expressly preempted."  Henning v. Luxury Brand Partners, LLC, No. 22-cv-07011-TLT, 2023

25   WL3555998, at *5 (N.D. Cal., May 11, 2023); see Gisvold v. Merck & Co., 62 F. Supp. 3d 1198,

26   1203 (S.D. Cal. 2014).

27       However, Section 379r does not preempt claims under state law that impose identical or

28   "parallel" requirements to FDA regulations.  Riegel v. Medtronic, 552 U.S. 312, 330 (2008); see

1   <u>Ebrahimi v. Mentor Worldwide LLC</u>, 804 Fed. Appx. 871, 872 (9th Cir. 2020) (mem.).   As

2   recognized by the Ninth Circuit, the Supreme Court of the United States in "<u>Buckman</u> . . . left the

3   door open to state-law claims 'parallel' to federal requirements."   <u>McClellan v. I-Flow Corp.</u>,

4   776 F.3d 1035, 1040 (9th Cir. 2015); <u>see</u> <u>Davidson v. Sprout Foods, Inc.</u>, 106 F.4th 842, 849 (9th

5   Cir. 2024), discussing <u>Buckman Co. v. Plaintiffs' Legal Committee</u>, 531 U.S. 341 (2021).   To

6   avoid preemption, "[t]he plaintiff must be suing for conduct that *violates* the FDCA (or else his

7   claim is expressly preempted [ ]) but the plaintiff must not be suing *because* the conduct violates

8   the FDCA (such a claim would be impliedly preempted under <u>Buckman</u>)."   <u>Perez v. Nidek Co.,</u>

9   <u>Ltd.</u>, 711 F.3d 1109, 1120 (9th Cir. 2013) (citation omitted) (emphasis in original).

10              **2.   Benzene Warning on Label and Reformulation.**

11              The upshot of the regulations and the acne monograph, described above, is that a drug

12   that complies with all monograph requirements is not misbranded.   21 C.F.R. § 330.10(a)(1)

13   ("The Commissioner shall . . . evaluate the safety and effectiveness of OTC drugs, to review

14   OTC drug labeling, and to advise him on the promulgation of monographs establishing

15   conditions under which OTC drugs are generally recognized as safe and effective and not

16   misbranded"); <u>see also</u> 21 C.F.R. § 333.301(a) ("An over-the-counter acne drug product in a

17   form suitable for topical application is generally recognized as safe and effective and is not

18   misbranded if it meets each of the conditions in this subpart and each general condition

19   established in § 330.1 of this chapter.").

20              Here, the acne monograph lists BPO as a permitted active ingredient and does not require

21   manufacturers to warn consumers of benzene, or mention benzene in any capacity on the label.

22   U.S. Food & Drug Admin., Over-the-Counter (OTC) Monograph M006: Topical Acne Drug

23   Products for Over-the-Counter Human Use; <u>see also</u> 21 C.F.R. § 333.310(a); 21 C.F.R.

24   § 333.350(c)(4).   The FDA's monograph "allows [topical acne drugs] to be formulated with the

25   active ingredient [BPO] and does not require disclosure that [BPO] may degrade into [benzene]."

26   <u>Williams v. Galderma Laboratories</u>, L.P., No. 24 CV 2222, 2024 WL 4213220, at *3 (N.D. Ill.

27   Sept. 17, 2024), quoting <u>Truss v. Bayer Healthcare Pharms. Inc.</u>, No. 21 CV 9845 (VB), 2022

28   WL 16951538, at *4 (S.D.N.Y. Nov. 15, 2022); <u>see Mut. Pharm. Co. v. Bartlett</u>, 570 U.S. 472,

1 | 488-90 (2013).

2 |      Therefore, to the extent Plaintiff's claims are based on allegations that Walmart should

3 | have warned about the presence of benzene on Walmart's BPO product labels, that theory is

4 | expressly preempted because it would be an "addition" not required by federal law.  21 U.S.C.

5 | § 379r(a); see Howard, 2024 WL 4272931, at *7.  Moreover, regarding Plaintiffs' allegations

6 | involving reformulations of the BPO products, this theory too is expressly preempted because

7 | requiring Walmart to reformulate its BPO products clearly would be an "addition" not required

8 | by federal law.  21 U.S.C. § 379r(a); see Howard, 2024 WL 4272931, at *7.  The Court will

9 | recommend granting Walgreen's motion to dismiss as to these aspects of preemption.

10 |      **3.  Benzene as an Inactive Ingredient.**

11 |      While only hinted by Plaintiffs (see ECF No. 43, ¶ 175, 177), the Court notes that

12 | Plaintiffs seemingly set groundwork for a claim to be based on that benzene should have been

13 | listed as an inactive ingredient on Walmart's BPO label.  (see ECF No. 53, p. 18.)  However, this

14 | theory is also preempted.

15 |      Federal regulations require drug manufacturers to list all active and inactive ingredients

16 | on the drug's label.  21 C.F.R. § 201.66(c).  Active ingredients, such as BPO, are those that are

17 | "intended to furnish pharmacological activity" in the human body.  Id. at § 201.66(b)(2).

18 | Inactive ingredients, by contrast, are "any component other than an active ingredient."  Id. at

19 | § 201.66(b)(8).

20 |      Whether Walmart needed to list benzene as an inactive ingredient on its BPO products'

21 | labels turns on whether benzene is a "component."  That term is not defined in part 201, which

22 | relates to labeling requirements.  Component is defined, however, in a different portion of the

23 | same subchapter related to manufacturing: "Component means any ingredient intended for use in

24 | the manufacture of a drug product, including those that may not appear in such drug product."

25 | 21 C.F.R. § 210.3(b)(3).  If this definition is used, then benzene is not an inactive ingredient

26 | because it is not intended for use; it is an "unintended contaminant."  Williams v. Galderma

27 | Laboratories, L. P., No. 24 CV 2222, 2024 WL 4213220, at *4 (internal quotation omitted).

28 |      The Court finds persuasive the approach taken by multiple district courts in substantially

similar contexts regarding how to give effect to the term "component." To begin with, both part 210 and part 201 "are within the same subchapter regulating drugs, and 21 C.F.R. § 210.3(b)(3) provides the only definition of 'component' within the subchapter." <u>Williams</u>, 2024 WL 4213220, at *4, quoting <u>Barnes v. Unilever United States Inc.</u>, No. 21 C 6191, 2023 WL 2456385, at *7 (N.D. Ill. Mar. 11, 2023); <u>see</u> <u>Truss</u>, 2022 WL 16951538, at *4. Second, when the FDA added the definition of "inactive ingredient" to part 201, it noted "that the definition 'is identical to the definition in the agency's good manufacturing practice regulations in 21 CFR 210.3(b)(8).'" <u>Id.</u>, quoting Over-The-Counter Human Drugs; Labeling Requirements, 64 Fed. Reg. 13254, 13258 (Mar. 17, 1999). Therefore, because "the FDA notes that the definitions are identical, it follows that the term 'component' used in both definitions was intended to have the same meaning." <u>Id.</u>, quoting <u>Barnes</u>, 2023 WL 2456385, at *7.

Accordingly, the Court concludes that it is rational that the FDA would impose consistent requirements and definitions on manufacturers. <u>Williams</u>, 2024 WL 4213220, at *4; <u>see</u> <u>Howard</u>, 2024 WL 4272931, at *8; <u>Barnes</u>, 2023 WL 2456385, at *7; <u>Truss</u>, 2022 WL 16951538, at *4; <u>see also</u> <u>Eisman</u>, 2025 WL 241024 at *4 (OTC Coal Tar drug monograph).

Based on the forgoing, the Court concludes that benzene is not an inactive ingredient under federal law and Walmart was therefore not required to list it on its BPO product labels. The Court will recommend granting Walmart's motion to dismiss insofar as Plaintiffs seek to use this preempted theory as a basis for their claims.

### 4. Benzene as a Result of cGMP Violations.

The Court turns to whether Plaintiffs' claims can proceed under the theory that the presence of benzene in Walmart's BPO products stems from Walmart's failure to adhere to cGMPs. (<u>See</u> ECF No. 49-1, p. 12-14; ECF No. 53, pp. 6-10.) Whether and to what extent cGMPs may form the basis of parallel state-law claims has recently been explored by the Ninth Circuit. In <u>Davidson v. Sprout Foods, Inc.</u>, the Ninth Circuit discussed two lines of case. 106 F.4th 842 (9th Cir. 2024). The Court first observed the line of cases where private citizens attempted to directly enforce the FDCA but discussed that those claims were held to be impliedly preempted. <u>Id.</u> at 849. Second, the Court noted cases where a private citizen brought state law

claims that paralleled duties owed under federal requirements.  Id. at 849-50.  The Ninth Circuit reaffirmed its position that a plaintiff can potentially raise a parallel state law claim without implicating implied preemption if the state law imposing requirements are identical to those contained in the FDCA, before specifically holding that "the FDCA [did] not impliedly preempt [the] plaintiffs' [California parallel] claims."  Id. at 850.

Here, Plaintiffs allege violations of federal law: drugs are considered adulterated when not manufactured in accordance with cGMPs.  See 21 U.S.C. § 331(a); 21 C.F.R. § 351(a)(2)(B).  To vindicate their rights, Plaintiffs bring various state law consumer fraud and related claims— not relying on the FDCA.  Therefore, the Court concludes that to the extent Plaintiffs' state law claims are parallel claims brought for violations of cGMPs, those claims are not categorically preempted.

Yet, in its reply, Walmart acknowledges that parallel state-law claims are permissible, but Walmart argues that Plaintiffs have not brought such claims.  (ECF No. 54, p. 4.)  Plaintiff generally disagrees.  While the Court ultimately agrees with Plaintiffs here, it does appear that how Plaintiffs have pleaded their UCL claim, for example, is not as precise as it could be.

Plaintiffs' first claim invokes California's UCL but cites to no other California statute that would be the basis state-law parallel claim.  In other words, it appears at first glance that Plaintiffs seemingly rely on the UCL to enforce the FDCA, which would not available due to preemption in this area of the law.  Perez, 711 F.3d at 1120.  To be sure, the UCL may be used in other contexts with federal statutes as a predicate, see Rose v. Bank of America, N.A., 57 Cal. 4th 390, 396-97 (Cal. 2013), but the Ninth Circuit has been clear that, in this context, that "[t]he plaintiff must be suing for conduct that *violates* the FDCA (or else his claim is expressly preempted [ ]) but the plaintiff must not be suing *because* the conduct violates the FDCA (such a claim would be impliedly preempted under Buckman)."  Perez, 711 F.3d at 1120.  Thus, where a claim "exists solely by virtue of the FDCA . . . requirements" rather than a state law duty, such a claim is impliedly preempted.  Davidson, 106 F.4th at 849.

Here, as pleaded, the Court understands how to Walmart that the UCL claim appears to exist only by virtue of the FDCA requirements, and therefore, it would be impliedly preempted.

1   That said, Plaintiffs are aware of the appropriate state-law regulation that is parallel to the

2   FDCA, Cal. Health & Safety Code § 111260 (ECF No. 43, ¶ 94), and therefore, it might be wise

3   for Plaintiffs to make these direct connections, when necessary, in their claims as opposed to

4   requiring Walmart and the Court to put the pieces together in a complex pleading.

5           Accordingly, the Court concludes that to the extent Plaintiffs' state law claims are

6   parallel claims brought for violations of cGMPs, those claims are not categorically preempted.

7   See also Daugherty, 794 F.Supp.3d at 691-94 (cautioning the plaintiffs that their cGMPs claims

8   might nonetheless be impliedly preempted by "obstruction preemption").   The Court will

9   recommend denying Walmart's motion as to this aspect of preemption.

10          **C.      Failure to State a Claim.**

11          Walmart argues that even if Plaintiff's claims based on cGMPs are not preempted, they

12  have not fulfilled the pleading standards under Federal Rule of Civil Procedure 8.  (ECF No. 49-

13  1, pp. 26-28.)  In particular, Walmart homes in on plausibility.  (Id.)  For their part, Plaintiffs

14  direct the Court to the allegations they perceive as meeting Rule 8 as well as noting a similar

15  case where a district court denied a motion to dismiss.  (ECF No. 53, pp. 10-12.)  Even viewing

16  the facts in the light most favorable to Plaintiffs, the Court agrees with Defendants that Plaintiffs

17  have failed to state a claim.

18          **1.      Rule 8: Plausibility.**

19          The Court begins by quoting the allegations Plaintiffs have cited to as meeting Rule 8:

20              As the manufacturer and distributor of the Products, Defendant has
21              a duty to ensure that it complies with Current Good Manufacturing
                Practice ("CGMP") regulations and ensure its Products meet
22              minimum safety standards.

    (ECF No. 43, ¶ 53.)
23

24              Whether during the manufacturing or holding process, the Products
                should not have become adulterated with benzene.  The presence
25              of benzene above 2 ppm—which, upon information and belief,
                resulted from Defendant's failure to comply with cGMPs—renders
26              the Products both adulterated under the FDCA.  The mechanism by
                which BPO degrades into benzene is known (high temperatures).
27              Had the manufacturing inputs, manufacturing, and holding process
                been conducted within acceptable temperatures, as required by the
28              cGMP regulations cited above, it is unlikely that any benzene
                would be present in the Products.  Thus, Plaintiffs believe that it

was the manufacturing and holding of the Products at unacceptable temperatures that causes the benzene contamination and/or any instability in the Products.   Additionally, had the benzene contamination been from improper inputs, failure to clean, maintain, and sanitize equipment, or failure to establish control manufacturing and holding procedures, it still would be a violation of the cGMP.  Accordingly, Defendant violated the cGMP by not manufacturing or holding the Products under proper conditions, with proper quality controls.

(Id. at ¶ 104.)

FDA guidance permits up to 2 ppm benzene in a pharmaceutical product if its use in the manufacturing process is "unavoidable." Benzene is not a necessity, or even intended, part of the Product's manufacturing process.  Given the long history and widespread use of acne products without any benzene contamination, the use of benzene in the Products is not "unavoidable."  But regardless, Defendant's Products contain levels of benzene well above 2 ppm. Therefore, Defendant's Products could not possibly meet the cGMP testing requirements, as they would not have been released if properly tested.  As noted above, cGMP requires testing at all relevant phases of the production and holding process, and at release of the Products, to ensure the Products' safety, identity, strength, quality or purity.  Accordingly, Defendant's violated the cGMP by establishing, maintaining, and conducting proper benzene testing throughout its manufacturing process.

(Id. at ¶ 105.)

Defendant also knew, or should have been aware, that the Products were adulterated with benzene or would become adulterated with benzene.  Defendant must also do stability testing to understand the "shelf life" of the Products and to assign an expiration date.  It is well known that certain chemical ingredients can degrade or change because of environmental and storage conditions such as light, moisture, temperature, and humidity, or because of the passage of time.  The stability testing should cover all expected distributor and consumer storage, handling, and use conditions and must be done using "reliable, meaningful, and specific test methods."  If any stability testing finds that a Product is not stable under expected storage or use conditions, degrades, or create toxic byproducts, the Product cannot be sold to the public.   Here, stability testing found that Defendant's formulation of the Products is unable to ensure that the Products do not contain unacceptable levels of benzene through their normal shelf-life.   This is an additional violation of the cGMP.

(Id. at ¶ 106.)

Defendant's BPO Products did not conform to its final monograph specifications after its effective date, in violation of 21 C.F.R. § 330.10(b), which demonstrates inadequate production, process, and quality oversight by Defendant.

1    (Id. at ¶ 107.)

> Defendant's failure to conform to cGMPs resulted in the production, and ultimate sale to consumers, of BPO Products that were so highly contaminated and/or adulterated with benzene that they could not be legally sold in the United States, yet Defendant still falsely labeled and marketed its illegal Products as compliant with state and FDCA drug regulations. That Defendant's BPO Products were able to reach the U.S. market with such high levels of benzene indicates that there was a critical failure in Defendant's quality control and testing protocols as required by the above-referenced cGMPs as incorporated into state law.

(Id. at ¶ 108.)

Walmart takes three positions. First, Walmart takes issue with Plaintiffs' logic, arguing that in the operative complaint Plaintiffs recite verbatim the cGMPs and then, based upon information and belief, assume that Walmart must have violated the cGMPs because if Walmart had complied with cGMPS, then no benzene would have been detected in the BPO products. (ECF No. 43-1, p. 15.)

Second, Walmart argues that there are no allegations demonstrating that *all* BPO products were manufactured in violation of cGMPs, resulting in the presence of benzene. (Id. at p. 16.) Walmart notes that its products are private label versions of multiple types of BPO acne medications (*i.e.*, creams, cleansers, lotions, and gels). (Id.) Walmart observes that there are no allegations that would support that each of these acne mediations would all be manufactured in an identical fashion throughout the class period. (Id.)

Last, Walmart argues that Plaintiffs do not allege how the purported degradation of BPO into benzene in the BPO products occurred in a systematic and uniform way. (Id.) Walmart observes that not only have Plaintiffs brought claims regarding different product mediums but also products with different concentrations of BPO. (Id.) To be sure, Walmart acknowledges that Plaintiffs have identified that BPO can degrade into benzene when exposed to high temperatures, but Walmart points out that Plaintiffs also acknowledge that such degradation could occur at several different ways, including manufacturing or during holding. (Id.) Yet, at the same time, Plaintiffs also take the position that benzene contamination could have occurred completely unrelated to temperature, instead caused by improper imputes, failure to clean,

1  maintain, and sanitize equipment.  (Id.)  Thus, Walmart argues that given that Plaintiffs'

2  allegations are conclusory and/or internally inconsistent, there is no plausible basis to conclude

3  that the alleged degradation process would be uniform in all BPO products and necessarily

4  resulted in benzene adulation of every single product during the class period.  (Id. at p. 17.)

5      In their opposition, Plaintiffs' position is that the allegations quoted above speak for

6  themselves.  (ECF No. 53, pp. 11-12.)  Plaintiffs then rely on an order denying a motion to

7  dismiss in Williams v. Galderma Labratories, L.P., a case from the Northern District of Illinois.

8  The Court will address Williams before the plausibility of Plaintiffs' claims.

9      Similar to here, in Williams, the plaintiff alleged that the defendant, a manufacturing

10  laboratory, manufactured an OTC acne product that degraded into benzene, utilizing the same

11  Valisure study implicated in this case.  2024 WL 4213220, at *1.  Among other claims, the

12  plaintiff brought unfair and deceptive practices claim under the Illinois Consumer Fraud and

13  Deceptive Business Practices Act (the same law affecting certain Plaintiffs herein).  Id.  As

14  relevant here, regarding potential parallel state-law claims, the district court discussed that in its

15  view another district court opinion, from the Northern District of Illinois, was instructive and

16  essentially adopted that court's reasoning.  Id., citing Barnes v. Unilever United States Inc., No.

17  21 C 6191, 2023 WL 2456385 (N.D. Ill. Mar. 11, 2023).

18      However, the Court finds that the case relied upon in Williams to be distinguishable.  In

19  Barnes, the plaintiffs sued alleging that the defendant manufactured antiperspirant aerosol and

20  spray products that contained benzene and distributed those products in retail stores in the United

21  States.  2023 WL 2456385, at *1.  Not unlike this case, the plaintiffs relied upon a study

22  produced by Valisure that found that certain antiperspirant aerosol products contained benzene

23  when tested.  Id.  Critically, "[t]he amended complaint also identifie[d] several statements

24  regarding product safety and testing from [the defendant's] website that [the plaintiffs] allege[]

25  are false and misleading."  Id. at *2.  In its analysis, the court in Barnes focused on that the

26  plaintiff's claims were premised on "the [defendant] website's safety statements," which the

27  plaintiffs had alleged were false.  Id. at *4.  The Barnes court then relied upon Seventh Circuit

28  authority, in a trademark deception case, that observed that a "complaint [wa]s sufficient" where

1    it "allege[d] precisely the statement . . . that is asserted to be false, and the exact reason . . . why

2    the statement was false." Id., quoting Vincent v. City College of Chicago, 485 F.3d 919, 925

3    (7th Cir. 2007). In other words, while the plaintiffs in Barnes were bringing parallel state-law

4    claims regarding potential violations of cGMPs as to aerosol antiperspirant sprays, the plaintiffs

5    also alleged that the defendant had affirmatively made false statements on their website. Id. By

6    contrast, here, Plaintiffs have essentially alleged that Walmart failed to include a warning on its

7    labeling, packaging, and advertising. Therefore, the analysis in Barnes and Vincent is inapposite

8    to the case at bar. See Bojko, 2023 WL 4204663, at *7-*8 (contrasting affirmative statements

9    against omissions). And because Williams relied upon these cases for its determination that the

10   plaintiff had met the applicable pleading standards, the Court finds Williams to not be persuasive

11   on this point.

12        Turning to plausibility, the Court agrees with Walmart. The allegations identified by

13   Plaintiffs seemingly require assuming that because benzene was later discovered in third-party

14   testing of Walmart's BPO products, that this necessarily, in and of itself, leads to the plausible

15   conclusion that Walmart failed to abide by the cGMPs as required by the monograph. Thus,

16   there appears to be a missing step in this logic chain. To be sure, Plaintiffs have identified high

17   temperatures as a possible source for BPO in products degrading into benzene, but Plaintiffs also

18   identify, separately, that benzene contamination might have occurred due to improper inputs,

19   failure to clean or sanitize equipment, or failing to establish control manufacturing or holding

20   procedures. Additionally, Plaintiffs allege that Walmart failed to test its BPO products during

21   manufacturing or for shelf-stability. Yet, these allegations are, again, tied only to later testing,

22   not of the exact products Plaintiffs purchased, that identified that BPO can breakdown into

23   benzene in the subject acne products when exposed to high temperatures. Finally, as Walmart

24   points out in its reply, Plaintiff has not contended with the fact that they bring claims of various

25   product mediums with varying BPO concentrations. It strains credulity that each different

26   product would be manufactured in the same way and/or potentially degrade at the same rate.

27        While in the context of a Class III medical device and on appeal following summary

28   judgment, the Court finds Walmart's reliance on Weber to be persuasive. In Weber, the Ninth

1    Circuit discussed that "*[r]es ipsa loquitor*" was not enough to survive the relevant FDA

2    preemption.  940 F.3d at 1113.  Relatedly, the <u>Weber</u> Court continued, discussing that even

3    assuming without deciding that cGMPs can form the basis of the relevant state parallel claim, the

4    plaintiff had failed to state a claim because "the mere evidence suggesting that her particular

5    [medical device] was defective does not show that [the defendant] failed to comply with the

6    FDA's Current Good Manufacturing Practices."  <u>Id.</u>  While not an exact analogy, the Court is

7    persuaded by the logical underpinnings of <u>Weber</u> and finds that Plaintiffs' allegations do not

8    meet Rule 8 pleading standards because they are too conclusory and rely on circular reasoning.

9              **2.  Specificity and Rule 9.**

10            Furthermore, on its own, the Court finds that Plaintiffs have failed to allege with

11    specificity that the state statutes in Plaintiffs' list (ECF No. 43, ¶ 94) impose requirements that

12    are parallel to federal requirements, *i.e.*, identical to those imposed by federal law.  Though

13    Plaintiffs provide an exhaustive list of state statutes, they do so without demonstrating that these

14    state regulations actually impose requirements identical to federal ones.  The Court observes that

15    certain statutes appear to merely bar the sale of 'adulterated' drugs and do not necessarily

16    incorporate, as does California law, the federal law.  <u>See</u>, <u>e.g.</u>, 35 Pa. Stat. § 780-113(a)(1); Ga.

17    Code § 26-3-3(1).[7]  Thus, Plaintiffs have failed adequately to allege with specificity parallelism

18    of each state law asserted.

19            In addition, the Court notes that though Walmart has moved to dismiss only under Rule

20    8, Rule 9 pleading requirements are also in play because Plaintiffs' claims sound in fraud.  <u>Levitt</u>

21    <u>v. Yelp! Inc.</u>, 765 F.3d 1123, 1135 (9th Cir. 2014).  In alleging a claim grounded in fraud, "a

22    party must state with particularity the circumstances constituting fraud . . . ."  Fed. R. Civ. P.

23    9(b).  A court may dismiss a claim for failing to satisfy the heightened pleading requirements of

24    Rule 9(b).  <u>Vess v. Ciba-Geigy Corp. USA</u>, 317 F.3d 1097, 1107 (9th Cir. 2003).  Under this

25    heightened pleading standard, a party must "identify the who, what, when, where, and how of the

26    misconduct charged, as well as what is false or misleading about the purportedly fraudulent

27    _____

28    [7] To be sure, Pennsylvania and Georgia may have FDCA incorporation statutes, but Plaintiffs have not identified any as such in the first amended complaint.

1    statement, and why it is false." <u>Moore v. Mars Petcare US, Inc.</u>, 966 F.3d 1007, 1019 (9th Cir.

2    2020), quoting <u>Davidson v. Kimberly-Clark</u>, 889 F.3d 956, 964 (9th Cir. 2018).  The complaint

3    must contain enough detail to put a defendant on notice of the alleged misconduct so they may

4    "defend against the charge and not just deny that they have done anything wrong."  <u>Vess</u>, 317

5    F.3d at 1106.  "[C]laims based on an omission can succeed without the same level of specificity

6    required by a normal fraud claim."  <u>Miller v. Ford Motor Co.</u>, No. 2:20-cv-01796-TLN-CKD,

7    620 F. Supp. 3d 1045, 1068 (E.D. Cal. Aug. 10, 2022) (citation and internal quotation marks

8    omitted).  When a plaintiff alleges a unified course of fraudulent conduct and relies entirely on

9    that course of conduct as the basis of that claim, that claim is said to be "'grounded in fraud' or

10   to 'sound in fraud,' and the pleading . . . as a whole must satisfy the particularity requirement of

11   Rule 9(b)."  <u>Kearns v. Ford Motor Co.</u>, 567 F.3d 1120, 1125 (9th Cir. 2009) (discussing in

12   context of CLRA and UCL claims).

13        As with the Rule 8 analysis above, the Court reiterates that Plaintiffs allege that Walmart

14   must have violated one of, if not all of, the 23 cGMP standards that they list (ECF No. 43, ¶ 103)

15   simply because benzene-contaminated BPO Products were allowed to enter the marketplace.

16   Yet, Plaintiffs do not assert *how* Walmart violated or deviated from specific cGMP standards and

17   *how* such deviations led to the adulteration of its BPO products. Again, Plaintiffs seemingly rely

18   on the circular reasoning that because benzene was found after testing products that made it to

19   the U.S. market, there must have necessarily been a violation of the cGMPs by Walmart.

20   Because of the lack of specificity, the first amended complaint also fails to state a claim under

21   Rule 9.[8]

22        In sum, the Court finds that Plaintiffs have failed to state a claim regarding those claims

23   not preempted, under both Rule 8 and Rule 9.  Therefore, the Court will recommend granting

24   Walmart's motion to dismiss as to state law parallel claims not preempted.

25        **D.     Injunctive and Equitable Relief.**

26        Separately, Walmart argues that Plaintiffs have failed to plead allegations that would

_____

27   [8] Relatedly, greater specificity as to how the cGMPs were violated is necessary to determine whether the alleged
     violation(s) require interpretation of the cGMP requirements which could implicate implied preemption.  <u>See</u>
28   <u>Daugherty</u>, 794 F.Supp.3d at 695.

1   afford them standing for injunctive relief and that Plaintiffs may not plead equitable relief in the

2   alternative when they have an adequate remedy in law.  (ECF No. 49-1, pp. 19-20, 24-25.)

3   Because the Court has found that Plaintiffs have failed to state a claim, the Court finds that

4   discussion of these issues would be premature.

5          **E.     Leave to Amend.**

6          Under Rule 15(a) of the Federal Rules of Civil Procedure, leave to amend shall be freely

7   given when justice so requires.  Fed. R. Civ. P. 15(a)(2).  "In the absence of . . . undue delay, bad

8   faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by

9   amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of

10  the amendment, futility of amendment, etc.—the leave sought should . . . be 'freely given.'"

11  Foman v. Davis, 371 U.S. 178, 182 (1962), quoting Fed. R. Civ. P. 15(a).  In other words,

12  "[a]bsent prejudice, or a strong showing of any of the remaining Foman factors, there exists a

13  presumption under Rule 15(a) in favor of granting leave to amend."  Eminence Capital, LLC v.

14  Aspeon, Inc., 316 F.3d 1048, 1052 (9th Cir. 2003).

15         The Court finds that leave to amend should be granted in its entirety.  The Court observes

16  that Plaintiffs operated in their complaint from the understanding that certain theories were not

17  preempted by federal law, which allowed them to bring an aspirational complaint in terms of

18  theories and relief.  Even with the Court's conclusions regarding preemption and the plausibility

19  of Plaintiffs' claims as presently pleaded, the Court will recommend granting leave to amend

20  with the understanding that Plaintiffs will do so only to the extent they believe in good faith they

21  can plead additional factual material that could satisfy the legal standards and deficiencies

22  identified above.  See Fed. R. Civ. P. 15(a)(2); Lopez v. Smith, 203 F.3d 1122, 1130 (9th Cir.

23  2000).  Though Walmart states that leave should not be given because Plaintiffs proceed on a

24  first amended complaint, the Court notes that the instant motion is the first test of Plaintiffs'

25  allegations on a motion to dismiss, which further counsels giving leave to amend.

26                                    **VI.**

27                   **CONCLUSION AND RECOMMENDATION**

28         Based on the foregoing, IT IS HEREBY RECOMMENDED that Defendants' motion to

dismiss (ECF No. 49) be GRANTED as follows:

      1.      The motion to dismiss as to standing be DENIED;

      2.      The motion to dismiss as to preemption of theories of failure to include a warning label of benzene and failure to include benzene as an inactive ingredient be GRANTED with leave to amend;

      3.      The motion to dismiss as to preemption on the theory that cGMPs may form the basis of state parallel claims be DENIED;

      4.      The motion to dismiss as to failure to state a claim be GRANTED with leave to amend; and

      5.      The remainder of the motion to dismiss be DENIED as MOOT.

These findings and recommendations are submitted to the district judge assigned to this action, pursuant to 28 U.S.C. § 636(b)(1)(B) and this Court's Local Rule 304. **Within fourteen (14) days** of service of this recommendation, any party may file written objections to these findings and recommendations with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." The district judge will review the magistrate judge's findings and recommendations pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal. Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014), citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   **December 12, 2025**

STANLEY A. BOONE
United States Magistrate Judge

32