# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GRACE NAVARRO, et al.,<br>Plaintiffs,<br>v.<br>WALMART, INC.,<br>Defendant. | Case No. 1:24-cv-00288-JLT-SAB<br><br>FINDINGS AND RECOMMENDATIONS RECOMMENDING GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS<br><br>(ECF No. 69)<br><br>**OBJECTIONS DUE WITHIN FOURTEEN DAYS** |

Pending before the Court is Defendant Walmart Inc.'s ("Walmart") second motion to dismiss. The Court determined to take this matter under submission. L.R. 230(g). Having considered the moving papers as well as the Court's file, the Court issues the following findings and recommendations recommending granting in part and denying in part Walmart's motion to dismiss.

## I.

## REGULATORY BACKGROUND

This is a consumer fraud, consolidated class action regarding alleged economic harms caused by the sale of Walmart's benzol peroxide ("BPO") acne treatment drug products to Plaintiffs.[1] (ECF No. 66, ¶ 1.) Acne is the most common skin condition in the United States with

[1] Plaintiffs are Grace Navarro (California), Chatham Mullins (Massachusetts), Christopher Emery (Missouri), Anthony Ryan (Missouri), Skylar Williams (Illinois), Jared J. Smith (Nevada), Kelli Hunt (Missouri), Lindsey Smith (Washington State), April Diggins (Pennsylvania), Ramon Soto (Illinois), Kathlyn Averitt (Illinois), Scott Linman

a prevalence among adolescents of almost 95 percent. (Id. at ¶ 55.) Millions of acne sufferers seek treatment every year making it a highly competitive, billion-dollar industry and a key business segment for Walmart, who sells BPO Products under its private label. (Id. at ¶ 55.) Federal regulations require manufacturers to test their products, including stability testing, to prevent benzene contamination and BPO degradation, ensuring that a BPO product's active ingredient does not prematurely degrade into benzene. (Id. at ¶ 7.) Plaintiffs allege that benzene is restricted by the Food and Drug Administration ("FDA") to 2 ppm where its use in manufacturing is "unavoidable" in order to produce a drug product with a significant therapeutic advance. (Id. at p. 27.)

Under federal law, pharmaceutical drugs must be manufactured in accordance with current Good Manufacturing Practices ("cGMPs") to ensure they meet safety, quality, purity, identity, and strength standards. See 21 U.S.C. § 351(a)(2)(B); (see also ECF No. 66, ¶¶ 119, 136, 148.) Entities at all phases of the design, manufacture, and distribution chain are bound by these requirements. (ECF No. 66, ¶ 168; see also id. at ¶ 133.) The cGMP regulations require over the counter ("OTC") drug products meet such standards. See 21 U.S.C. § 351(a)(2)(B) In other words, the cGMPs

> establish minimum current good manufacturing practice for methods to be used in, and the facilities or controls to be used for, the manufacture, processing, packing, or holding of a drug to assure that such drug meets the requirements of the act as to safety, and has the identity and strength and meets the quality and purity characteristics that it purports or is represented to possess.

21 C.F.R. § 210.1(a).

In addition, Plaintiffs allege that state and U.S. territorial drug regulation laws impose an independent duty on drug manufacturers to ensure that end purchasers receive drugs that are made in accordance with cGMPs. (Id. at ¶ 175.) This duty emanates from each state's adoption or adherence to federal cGMP and adulteration standards. (Id. at ¶¶ 175-77.) Any drug product not manufactured in accordance with cGMPs is deemed "adulterated" and may not be distributed or

---

(Arizona), Dawn Martin (Nevada), Brett A. Gooden (Illinois), Erica L. Millbank (Washington State), Stephanie Welch (Washington State), Kristin Davis (Pennsylvania), Kara Philbrick (Connecticut), Alexandra Donato (Pennsylvania), Nicole Araujo (Connecticut), Dean P. Damico (Nevada), Tiffany Richmond (Ohio), Jennifer Harper (Missouri), Lorrie Potter (Ohio), Jessica Farias (Maryland), Nanea Tannehill (Hawaii), Alicia M. Baldwin (Illinois), Jennifer Irizarry (Maryland), Theresa Dean (Illinois), Charlene Dotson Orange (Missouri), Jasmine N. Cooper (Ohio), Dawin Timmons (Illinois), and Kendralanne Stafford (Illinois). (ECF No. 66, ¶¶ 13-44.)

sold in the United States. (Id. at ¶¶ 139, 144, quoting 21 U.S.C. §351(a)(2)(B).)

In 2010, the FDA issued a final rule to include benzoyl peroxide as a generally recognized as safe and effective ("GRASE") active ingredient in OTC topical drug products, known as a "monograph." (Id. at ¶¶ 115, 125-31); see also Classification of Benzoyl Peroxide as Safe and Effective and Revision of Labeling to Drug Facts Format; Topical Acne Drug Products for Over-The-Counter Human Use; Final Rule, 75 FR 9767-01, 2010 WL 723253 (F.R. Mar. 4, 2010). An OTC drug monograph establishes conditions, such as active ingredients, uses (indications), doses, routes of administration, labeling, and testing, under which an OTC drug in a given therapeutic category (*e.g.*, sunscreen, antacid, acne treatment) is generally recognized as safe and effective for its intended use. See Topical Acne Drug Products for Over-the-Counter Human Use; Final Monograph, 56 FR 41008-01, 1991 WL 156981 (F.R. Aug. 16, 1991). "Any product which fails to conform to an applicable monograph after its effective date is liable to regulatory action." 21 C.F.R. § 330.10(b); (ECF No. 66, ¶ 119.) In other words, once a final monograph goes into effect, it is illegal to sell a drug that no longer conforms to "each of the conditions contained in this part [330.1] and in an applicable monograph[.]" 21 C.F.R. § 330.1; (ECF No. 66, ¶ 128.). The "conditions contained in this part" include a requirement that "(a) [t]he product is manufactured in compliance with current good manufacturing practices, as established by parts 210 and 211 of this chapter." 21 C.F.R. § 330.1(a); (see ECF No. 66, ¶ 99.). In turn, parts 210 and 211 describe the cGMPs described above. Section 330.1 also requires all products subject to a monograph to be "in compliance with chapter V of the [FDCA,]" which prohibits the sale of adulterated or misbranded drugs. (ECF No. 66, ¶ 129.)

A drug is misbranded if the label is "false or misleading in any particular." (Id. at ¶ 130.) This includes failing "to reveal facts material . . . which may result from the use of the article under such conditions of use as are customary or usual," or including a component "dangerous to health under the conditions of use prescribed in the labeling or advertising thereof." (Id.) Under 21 U.S.C. § 351(a), a drug may adulterated under federal and various state laws if, "it consists in whole or in part of any filthy, putrid, or decomposed substance"; "it has been produced, prepared, packed, or held under insanitary conditions whereby it may have been contaminated with filth, or whereby it

may have been rendered injurious to health"; or "the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding do not conform to or are not operated or administered in conformity with current good manufacturing practice to assure that such drug meets the requirements of this chapter as to safety and has the identity and strength, and meets the quality and purity characteristics, which it purports or is represented to possess." (Id. at ¶ 131.)

In addition, pursuant to 21 U.S.C. § 351(b), a drug is legally deemed adulterated if it is recognized in an "official compendium" and its quality or purity falls below the standards set forth in that compendium. (Id. at ¶ 132.) Under 21 U.S.C. § 321(j), the term "official compendium" includes the United States Pharmacopœia ("USP") and incorporates USP standards by reference. (Id.) In Plaintiffs' view, "[t]hese regulations strictly prohibit benzene in excess of 2 ppm and require specific testing to ensure compliance." (Id. at ¶ 133.)

## II.

## BENZENE, BENZOL PEROXIDE, AND BPO PRODUCT BACKGROUND

Benzene is used primarily as a solvent in chemical and pharmaceutical industries, as a starting material and intermediate in the synthesis of numerous chemicals and in gasoline. (Id. at ¶ 64.) The major United States source of benzene is petroleum. (Id. at ¶ 64.) Benzene is a well-known human carcinogen that is not permitted to be used in pharmaceutical products unless absolutely avoidable. (Id. at ¶ 3.) There is no safe level of benzene exposure, and even in trace amounts, benzene is known to pose a health risk from exposure routes that include inhalation, ingestion, dermal absorption, and skin or eye contact. (Id. at ¶¶ 66, 74; see id. at ¶ 73.) The health hazards of benzene have been recognized for over one hundred years, and the scientific and regulatory communities agree that benzene is a known human carcinogen with severe consequences to human exposure. (Id. at ¶ 65.) The World Health Organization ("WHO") recognizes that, "[h]uman exposure to benzene has been associated with a range of acute and long-term adverse health effects and diseases, including cancer and hematological effects." (Id. at ¶ 67.) WHO specifically outlines that benzene is a genotoxic carcinogen in humans and no safe level of exposure can be recommended. (Id. at ¶ 67.)

The Centers for Disease Control and Prevention conducted a toxicity assessment, which

demonstrated that benzene may harm the central nervous system and may affect reproductive organs. (Id. at ¶ 69; see id. at ¶ 74.) In addition, the FDA has recognized that benzene is a carcinogen that can cause cancer in human and classifies it as a "Class 1" solvent that should be avoided in drug manufacturing. (Id. at ¶¶ 146, 147.) Only if unavoidable may a drug product contain 2 ppm of benzene. (Id. at p. 27.) Plaintiffs assert that the FDA considers benzene contamination above 2 ppm to render a drug adulterated. (Id. at ¶ 81, 82; see also id. at p. 27.) Other national and international organizations have come to similar conclusions, including the National Institute for Occupational Safety and Health ("NIOSH"), National Cancer Institute, the National Toxicology Program, and the International Agency for Research on Cancer. (Id. at ¶¶ 67-70, 74.)

BPO is the active ingredient in Walmart's BPO products: "BPO, a dry white powder, is mixed with other ingredients to create topical drug creams, cleansers, scrubs, and washes for use on the face and body. BPO is formulated into these Products at concentrations up to 10%." (Id. at ¶ 59.) BPO degrades to benzene when exposed to high heat over time, a process that was first reported in scientific literature as early as 1936 and has been acted upon in industries other than the acne treatment product industry. (Id. at ¶¶ 63, 105.) Even short periods in higher temperatures can lead to increased benzene contamination. (Id. at ¶ 113.)

BPO products are "drugs" used to treat acne, formulated with BPO, along with other inactive ingredients, to make acne treatment creams, washes, scrubs, and bars. (Id. at ¶ 2, 125.) Before being sold to the public, BPO products must be made in conformity with current good manufacturing practices and must conform to quality, safety, and purity specifications. (Id. at ¶ 125.) Under the FDCA, a drug is adulterated "if it is a drug and the methods used in, or the facilities or controls used for, its manufacture, processing, packaging, or holding do not confirm to or are not operated or administered in conformity with current good manufacturing practice. . . ." (Id. at ¶ 131, quoting 21 U.S.C. § 351(a)(2).)

BPO Products are not designed to contain benzene, and no amount of benzene is acceptable in acne treatment products such as the BPO products manufactured, distributed, and sold by Walmart. (Id. at ¶ 168.) Plaintiffs allege that Walmart failed to disclose on the BPO products'

labeling or anywhere in its marketing that the BPO products contain benzene or that the products can degrade to form benzene. (Id. at ¶¶ 115, 122, 208.)

Plaintiffs allege that the topical application of BPO products specifically increases the absorption rate of benzene through the skin, thereby increasing the risk of harm. (Id. at ¶ 86.) "Direct exposure of the eyes, skin, or lungs to benzene can cause tissue injury and irritation." (Id.) Accordingly, Plaintiffs observe that NIOSH recommends protective equipment be worn by workers exposed or expecting to be exposed to benzene at concentrations of 0.1 ppm and defines "inhalation, skin absorption, ingestion, skin and/or eye contact" as exposure routes or paths. (Id. at ¶ 74.)

In December 2023, the FDA published guidance on its website in the form of an "Alert," stating: "Drug manufacturers with a risk for benzene contamination should test their drugs accordingly and should not release any drug product batch that contains benzene above 2 ppm[.] . . . If any drug product batches with benzene above 2 ppm are already in distribution, the manufacturer should contact FDA to discuss the voluntary initiation of a recall[.]" (Id. at ¶¶ 84.) The FDA specifically recognized that benzene contamination in drugs can result from certain ingredients that "may yield benzene under certain conditions" and that the "formation of benzene from benzoate can lead to an increase in benzene content over a drug's shelf-life' and should be considered when determining the appropriate timing for benzene testing, e.g., testing at release and on stability (21 CFR 211.165, 211.166), and establishment of an appropriate expiration date (21 CFR 211.137)." (Id. at ¶¶ 84.) Relatedly, the Environmental Protection Agency also recognizes that benzene is a known carcinogen for all routes of exposure. (Id. at ¶ 71.)

Plaintiffs assert that "[a]ll of this guidance leads to only one conclusion, that benzene should not be present in OTC drugs, even in the smallest amounts, unless absolutely unavoidable, due to the serious health risks." (Id. at ¶87.) "Because benzene is highly toxic and even trace levels present unacceptable risks, the presence or formation of benzene in topical OTC drugs such as BPO Products is dangerous and unlawful under federal and parallel state law." (Id. at ¶ 88.)

Valisure LLC ("Valisure") is an analytical laboratory and online pharmacy that tests medications and healthcare products to ensure their safety, quality, and consistency. (Id. at ¶ 89-91.) Valisure is accredited by the International Organization for Standardization ("ISO/IEC")

17025:2017 standards for chemical testing (PJLA Accreditation Number 94238) and is registered with the Drug Enforcement Administration (License # RV0484814). (Id.) On March 5, 2024, Valisure filed a citizen petition with Federal Food and Drug Administration, requesting a recall and suspension of sales of BPO from the U.S. market. (Id.)[2] In layman's terms, Valisure reported that it had tested and detected high levels of benzene in specific batches of BPO products, including the Walmart's Equate® Beauty Acne Wash 10% BPO cream. (Id. at ¶ 92.) More specifically, Valisure stated that "current evidence suggests that on-market BPO products could produce substantial amounts of benzene when stored at above-ambient temperatures, specifically 37°C (98.6°F), 50°C (122°F) and 70°C (158°F)." (Valisure Petition, p. 1; see ECF No. 66, ¶ 93.) Moreover, Valisure also detected the substantial production of benzene "emanating externally into the air surrounding an unopened benzol peroxide product," which implicates possible inhalation exposure. (Id. at p. 3.) Valisure observed that the problem with benzene in BPO products is seemingly due to the "inherent instability of the benzol peroxide molecule that breaks down and forms benzene." (Id. at p. 8) (emphasis omitted).

The citizen petition acknowledged the most recent guidance from the FDA, which in 2011 determined that "that benzoyl peroxide [2.5% to 10%] can be adequately labeled to minimize risks while delivering effective acne treatment." (Id. at p. 3.) Meanwhile prescription-strength BPO products require a warning that: "[t]he role of benzoyl peroxide as a tumor promoter has been well established in several animal species. However, the significance of this finding in humans is unknown." (Id.)

Valisure tested 66 different BPO products, both prescription and OTC, including at least one product from Walmart, incubating the products at 122 degrees Fahrenheit for 18 days. (Id. at

[2] *Valisure Petition*, available at https://assets-global.websitefiles.com/6215052733f8bb8fea016220/65e8560962ed23f744902a7b_Valisure%20Citizen%20Petition%20on%20Benzene%20in%20Benzoyl%20Peroxide%20Drug%20Products.pdf. Plaintiffs have unambiguously incorporated Valisure's citizen petition into the first amended complaint. (ECF No. 66, ¶¶ 89 n.41.) "Even if a document is not attached to a complaint, it may be incorporated by reference into a complaint if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim." United States v. Ritchie, 342 F.3d 903, 908 (9th Cir. 2003). "If the documents are not physically attached to the complaint, they may be considered if the documents' authenticity is not contested and the plaintiff's complaint necessarily relies on them." Lee v. City of Los Angeles, 250 F.3d 668, 688 (9th Cir. 2001) (cleaned up). Because the citizen petition is a filing with a government agency, and because Plaintiffs' claims necessarily rely on the findings detailed therein, the Court incorporates the citizen petition into the first amended complaint. In light of this, the Court will, where appropriate, cite to the citizen petition for precision of language, herein after "Valisure Petition."

pp. 15-18). Results demonstrated that there was a "substantial instability of BPO and its propensity to form concerningly high levels of benzene in only 18 days." (Id. at p. 18; see ECF No. 66, ¶ 93.) Valisure noted that 122 degrees Fahrenheit is a reasonable temperature to test because it is a temperature the products may be exposed to during distribution and because it is an "accepted incubation temperature" used in the pharmaceutical industry. (Id. at pp. 17-18.)[3] In addition, Valisure stated that it observed evidence that BPO product packaging may be porous to benzene, enabling some of the benzene "to escape into the environment or air around the package." (Id. at p. 22). Results from this 50° C stability testing showed that the Equate® Beauty Acne Wash 10% BPO cream contained some level of benzene ranging from a maximum of 2,000 ppm to 1.8 ppm. (ECF No. 66, ¶ 94.)

Valisure offered a possible future remedy to address BPO instability, suggesting the creation of reformulations of BPO-containing acre treatment products. (Valisure Petition, p. 25; see ECF No. 43, ¶ 149.) Nonetheless, the citizen petition seeks, among other relief, "to have the Commissioner and FDA request recalls and a suspension of sales for products containing the active pharmaceutical ingredient benzoyl peroxide, consistent with FDA's mandate to ensure the safety of prescription and over the counter the drugs in the United States." (Id. at p. 29).

Plaintiffs assert that they conducted independent testing on "BPO Products purchased by Plaintiffs' counsel [that] similarly shows benzene levels significantly above the FDA's recall threshold of 2 ppm. For example, testing conducted on three (3) of Defendant's Equate Acne Treatment Gel 10% BPO Products purchased in or around May 2024 showed benzene levels of 592.46 ppm (Lot # 0614742), 561.17 ppm (Lot # 0606804), and 626.66 ppm (Lot # 0605012), respectively." (Id. at ¶ 104.)

## III.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs in this action are 32 individuals from Arizona, Connecticut, Hawaii, Illinois, Maryland, Massachusetts, Missouri, Nevada, Ohio, Pennsylvania, and Washington State. (ECF No.

[3] Similar findings were made when Valisure tested certain products, incubating them at 158 degrees Fahrenheit. (Valisure Petition, pp. 19-21).

66, ¶¶ 13-44.) Each Plaintiff alleges that they bought a Walmart "Equate Beauty" acne product that contained BPO. (Id.) These include the Equate® Beauty Acne Foaming Cleanser 10% BPO, Equate® Beauty Maximum Strength Acne Wash 10% BPO, Equate® Beauty Acne Treatment Gel 10% BPO, Equate® Beauty Daily Acne Control Cleanser Cream 10% BPO, Equate® Beauty Purifying Cleanser 2.5% BPO, and Equate® Beauty Repairing Lotion 2.5% BPO. (Id.) Essentially, each Plaintiff alleges that they reviewed Walmart's BPO products' accompanying labels and disclosures, and they understood them as representations and warranties by the manufacturer that BPO products were properly manufactured, free from defects, safe for their intended use, and not adulterated or misbranded. (Id.; see id. at ¶ 45) Plaintiffs allege that they could not avoid their injury because without extensive testing, only done after purchase, could consumers be able to detect benzene contamination. (Id. at ¶ 46.)

With this understanding, Plaintiffs each made the decision to purchase the BPO products. (ECF No. 66, ¶¶ 13-44.) Plaintiffs offer they "suffered economic damages as a result of Defendant's violations of the state laws alleged herein." (Id.) When purchasing the BPO Products, Plaintiffs "reviewed the accompanying labels and disclosures, and understood them as representations and warranties by the manufacturer that the BPO Products were properly manufactured, free from defects, safe for their intended use, and not adulterated or misbranded. Plaintiff relied on these representations and warranties in deciding to purchase the BPO Products manufactured by Defendant, and these representations and warranties were part of the basis of the bargain." (Id.) Had Plaintiffs "known that they were not, in fact, properly manufactured, free from defects, safe for their intended use, or adulterated, misbranded, and illegal to sell, Plaintiff[s] would not have purchased and used the Products at all or would have paid significantly less for them." (Id.) Plaintiffs, in the future, "would be willing to purchase the Products, if assured that they were not adulterated and complied with federal manufacturing and holding standards." (Id. at ¶ 46.) Accordingly, Plaintiffs allege they were injured in fact and lost money as a result of Walmart's improper conduct. (Id.)

Defendant is Walmart Inc., a Delaware corporation with its principal place of business in Bentonville, Arkansas. (Id. at ¶ 47.) Walmart markets, sells, and distributes the BPO Products

throughout the United States and its territories, including Equate® Beauty Acne Foaming Cleanser 10% PBO, and Equate® Beauty Daily Acne Control Cleanser Cream 10% BPO, Equate® Beauty Purifying Cleanser 2.5% BPO, and Equate® Beauty Repairing Lotion 2.5%. (Id. at ¶¶ 47, 48, 58.) Walmart's Equate® BPO products are sold on Walmart's website, third-party websites, as well as sold by various retailers including Walmart, Walgreens, and Costco both online and in-store throughout the United States. (Id. at ¶ 48.) Plaintiffs allege that Walmart dominates the retail and consumer health care products' markets year after year and has consistently held the number-one ranking among America's Fortune 500 publicly traded companies for over a decade. (Id. at ¶ 56.) BPO products represent one of Walmart's key acne treatment lines and a significant portion of its retail pharmacy revenues. (Id. at ¶ 57.) According to Plaintiffs, Walmart's Equate-branded BPO products are less expensive than the national sellers. (Id. at ¶ 60.)

According to Plaintiffs, Walmart authorized the false, misleading, and deceptive marketing, advertising, distribution, and sale of its BPO products. (Id. at ¶ 48.) Plaintiffs assert that Walmart's BPO products are marketed as safe and effective OTC acne treatment. (Id. at ¶ 167.) However, Plaintiffs allege that Walmart's BPO products degrade into benzene making the products illegal to sell. (Id. at ¶¶ 2, 7, 8, 63, 115, 122, 139, 140.) Given the marketing as OTC drugs, Plaintiffs assumed that the BPO products met minimum federal safety criteria and were manufactured in compliance with FDA requirements, as well as in compliance with minimum standards established in the industry and were therefore fit for the ordinary purpose for which such goods are used. (Id. at ¶ 62, 170, 171, 172.)

Plaintiffs allege that Walmart had a duty to ensure that it complies with cGMPs and that its products meet minimum safety standards. (Id. at ¶¶ 115, 116, 119, 289-95.) Moreover, Plaintiffs allege that Walmart was aware of the established chemical processes that causes BPO to degrade into benzene when exposed to high temperatures or in other conditions. (Id. at ¶ 115.) Plaintiffs allege that though Walmart's BPO products should not have become adulterated with benzene, there was benzene above 2 ppm in the BPO products. (Id. at ¶ 119, 121.)

On March 8, 2024, Plaintiffs Grace Navarro and Chatham Mullins commenced this action. (ECF No. 1.) Following a previous motion practice, on March 4, 2026, the operative complaint

was filed by all Plaintiffs (ECF No. 66), bringing the following claims against Walmart:

1) violations of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, et seq.;

2) violation of California's Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750, et seq.;

3) false advertising under the laws of California, Hawaii, and New York;

4) deceptive trade practices under the law of California, Connecticut, Florida, Hawaii, Illinois, Maryland, Massachusetts, Michigan, Minnesota, Missouri, Nevada, New Jersey, New York, Ohio, Pennsylvania, Rhode Island, and Washington State;

5) breach of implied warranty of merchantability under the laws of California, Hawaii, Maryland, Massachusetts, Michigan, Minnesota, Missouri, Nevada, New Jersey, Pennsylvania, and Rhode Island;

6) negligent misrepresentation/omission on behalf of the nationwide class and subclasses; and

7) unjust enrichment/quasi-contract on behalf of the nationwide class and subclasses;

(Id. at ¶¶ 200-307.) For relief, Plaintiffs pray for an order certifying a proposed class; equitable relief; declaratory relief; restitution and/or damages; disgorgement; statutory damages; and attorney's fees and costs. (Id. at pp. 90-91.)

On March 27, 2026, Walmart moved to dismiss the action, and the district judge referred the motion to the undersigned for the preparation of findings and recommendations. (ECF Nos. 69, 72.) The motion has been fully briefed (ECF Nos. 74, 76), and on June 8, 2026, the Court took the matter under submission. (ECF No. 77.)

## IV.

## LEGAL STANDARDS

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to include "a short and plain statement of the claim showing that the pleader is entitled to relief." A complaint that fails to meet this standard may be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6). To overcome a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678

(2009), quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. "Plausibility requires pleading facts, as opposed to conclusory allegations or the formulaic recitation of the elements of a cause of action, and must rise above the mere conceivability or possibility of unlawful conduct that entitles the pleader to relief." Somers v. Apple, Inc., 729 F.3d 953, 959-60 (9th Cir. 2013) (cleaned up). "Factual allegations must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555.

In ruling on a Rule 12(b)(6) motion, the court "accept[s] all factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." Rowe v. Educ. Credit Mgmt. Corp., 559 F.3d 1028, 1029-30 (9th Cir. 2009) (citation omitted). But "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences" need not be accepted. In re Gilead Scis. Sec. Litig., 536 F.3d 1049, 1055 (9th Cir. 2008) (citation omitted). "Dismissal is appropriate when the complaint lacks a cognizable legal theory or sufficient factual allegations to support a cognizable legal theory." Saloojas, Inc. v. Aetna Health of Cal., Inc., 80 F.4th 1011, 1014 (9th Cir. 2023) (cleaned up).

## V.

## DISCUSSION AND ANALYSIS

Walmart first argues that all of Plaintiffs' claims are preempted, including Plaintiffs' cGMP claims. (ECF No. 69-1, pp. 8-14.) Second, Walmart contends that Plaintiffs' do not plausibly allege that Walmart violated any cGMP regulations. (Id. at pp. 14-18.) Third, Walmart takes the position that Plaintiffs lack standing to pursue injunctive relief. (Id. at pp. 18-19.) Fourth, Walmart argues that Plaintiffs' state-law claims independently fail. (Id. at pp. 19-21.)

Plaintiffs generally oppose, arguing that their adulteration and cGMP claims are not preempted. (ECF No. 74, pp. 1-16.) Plaintiffs then explained a refined argument as to why their misbranding claims are likewise not preempted. (Id. at pp. 16-21.) Plaintiffs then rebut Walmart's standing arguments, and finally, Plaintiffs respond in turn to Walmart's final arguments. (Id. at pp. 22-23.)

The Court takes the parties' arguments in turn but in an order the Court considers the most logical.

**A. Judicial Notice**

Plaintiffs have moved for judicial notice of the following: (1) a true and correct copy of the United States Food & Drug Administration's website, a page entitled "FDA alerts drug manufacturers to the risk of benzene contamination in certain drugs"; (2) a true and correct copy of the United States Food & Drug Administration's website, a page entitled "Facts About the Current Good Manufacturing Practice (CGMP)"; (3) a true and correct copy of USP Chapter 467 (Updated) on Residual Solvents; (4) a true and correct copy of Montenegro Appellants' Consolidated Opening Brief filed on February 18, 2025, in Montenegro v. RB Health (US), LLC, No. 25-6684 (9th Cir.); (5) a true and correct copy of Appellees' Consolidated Answering Brief filed on April 21, 2025, in Montenegro v. RB Health (US), LLC, No. 25-6684 (9th Cir.); (6) a true and correct copy of Montenegro Appellants' Consolidated Reply Brief filed on June 11, 2025, in Montenegro v. RB Health (US), LLC, No. 25-6684 (9th Cir.); (7) a true and correct copy of O'Dea Appellees' Consolidated Opening Brief filed on September 11, 2025, in O'Dea v. RB Health (US) LLC, No. 25-3240 (9th Cir.); (8) a true and correct copy of Appellees' Consolidated Answering Brief filed on November 12, 2025, in in O'Dea v. RB Health (US) LLC, No. 25-3240 (9th Cir.); and (9) a true and correct copy of O'Dea Appellants' Reply Brief filed on January 5, 2026, in O'Dea v. RB Health (US) LLC, No. 253240 (9th Cir.). (ECF No. 74-2.)

"As a general rule, 'a district court may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion.'" Lee v. City of Los Angeles, 250 F.3d 668, 688 (9th Cir. 2001), quoting Branch v. Tunnell, 14 F.3d 449, 453 (9th Cir. 1994). Doing so would convert a motion to dismiss into a motion for summary judgment. Fed. R. Civ. P. 12(d). However, a court may take judicial notice of a fact not subject to reasonable dispute, either because the fact is generally known within the territorial jurisdiction of the trial court or because the fact is capable of accurate and ready determination from sources whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201(b). Courts may also take judicial notice of undisputed matters of public record, Lee, 250 F.3d at 689, including documents filed in federal or state courts. Harris v. Cnty. of Orange, 682 F.3d 1126, 1132

(9th Cir. 2012). As relevant here, "[a]s a general matter, websites and their contents may be proper subjects for judicial notice." Jones v. Tonal Systems, Inc., 751 F. Supp. 3d 1025, 1031 (S.D. Cal. 2024). This is especially true where "allegations in the complaint necessarily rely [on the documents], even if not expressly referenced in the complained, provided that the authenticity of those documents are not in dispute." Id.

Furthermore, "[e]ven if a document is not attached to a complaint, it may be incorporated by reference into a complaint if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim." United States v. Ritchie, 342 F.3d 903, 908 (9th Cir. 2003). "If the documents are not physically attached to the complaint, they may be considered if the documents' authenticity is not contested and the plaintiff's complaint necessarily relies on them." Lee, 250 F.3d at 688 (cleaned up).

The Court finds judicial notice is appropriate. Specifically, the documents are webpages from governmental websites and filings in the Ninth Circuit, which are generally appropriate for judicial review. Walmart has not opposed. Thus, the Court GRANTS Plaintiffs' request for judicial notice. (ECF No. 74-2.)

**B. Preemption**

From the outset, Plaintiffs clarify that they bring three adulteration theories of how benzene allegedly gets into Walmart's BPO products. (ECF No. 74, pp. 3-16.) First, Plaintiffs outline that they believe Walmart's products are adulterated with benzene, pursuant to 21 U.S.C. § 351(a). (Id. at pp 3-8.) Second, Plaintiffs argue that Walmart's BPO products are adulterated under 21 U.S.C. § 351(b) by exceeding a 2-ppm limit. (Id. at pp. 8-9.) Third, Plaintiffs assert that Walmart's BPO products were adulterated pursuant to 21 U.S.C. § 351(a)(2)(b) as a result of cGMP violations. (Id. at pp. 9-16.) Last, Plaintiffs argue that their misbranding claims are likewise not preempted, notwithstanding the Court's prior ruling. (Id. at pp. 16-21.)

Walmart contends that Plaintiffs' arguments here really break down into two arguments regarding preemption on an adulteration theory (generally) and preemption on Plaintiffs' misbranding claims. (ECF No. 76, pp 1-4.) Walmart then goes a step further and argues that, again notwithstanding the Court's previous ruling, Plaintiffs' cGMP claims are preempted. (ECF No. 69,

pp. 11-14.)

This time, the Court agrees with Plaintiffs in all aspects.

**1. Preemption Legal Principles.**

"A fundamental principle of the Constitution is that Congress has the power to preempt state law." Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 372 (2000). Preemption comes in multiple forms—express, field, and conflict preemption—but the purpose of Congress is "the ultimate touchstone" for all of them. Gilstrap v. United Air Lines, Inc., 709 F.3d 995, 1003 (9th Cir. 2013), quoting Cipollone v. Liggett Grp., Inc., 505 U.S. 504, 516 (1992).

As relevant here, to ensure uniformity in the regulation of OTC drugs like Walmart's BPO products, the FDCA contains a broad express preemption provision, which provides that no state "may establish or continue in effect any requirement—(1) that relates to the regulation of a [nonprescription drug]; and (2) that is different from or in addition to, or that is otherwise not identical with, a requirement under" the FDCA. 21 U.S.C. § 379r(a). The statute defines "requirement" to include "any requirement relating to public information or any other form of public communication relating to a warning of any kind for a drug." 21 U.S.C. § 379r(c)(2).

OTC acne drug products, including Walmart's products, are governed by a comprehensive set of FDA regulations called a monograph, which includes certain labeling requirements. 21 C.F.R. §§ 330.1, 330.5, 330.10; 333.350. The Acne Monograph expressly permits BPO to be an active ingredient in these products in an amount from 2.5 to 10 percent. 21 C.F.R. § 333.310(a). Section 333.350 provides detailed instructions for labeling covered products, including specific warnings and directions that must be included for products containing BPO. 21 C.F.R. § 333.350(c)(4), (d)(2). The regulations provide that an OTC acne drug product "is generally recognized as safe and effective and is not misbranded if it meets each of the conditions" in the monograph and "each general condition" in 21 C.F.R. § 330.1. Id. at § 333.301. In turn, Section 330.1 specifies that OTC drugs must meet the conditions described therein and must be "labeled in compliance with chapter V" of the FDCA and "the format and content requirements in § 201.66." 21 C.F.R. § 330.1(c)(1). Chapter V of the FDCA prohibits the sale of adulterated or misbranded drugs. 21 U.S.C. §§ 331(a), 351, 352.

Consistent with Congress's intent to promote uniform drug regulation, "state law claims regarding the labeling or packaging of [OTC drugs] that are not identical to the [FDCA] are expressly preempted." Henning v. Luxury Brand Partners, LLC, No. 22-cv-07011-TLT, 2023 WL 3555998, at *5 (N.D. Cal., May 11, 2023); see Gisvold v. Merck & Co., 62 F. Supp. 3d 1198, 1203 (S.D. Cal. 2014). However, Section 379r does not preempt claims under state law that impose identical or "parallel" requirements to FDA regulations. Riegel v. Medtronic, 552 U.S. 312, 330 (2008); see Ebrahimi v. Mentor Worldwide LLC, 804 Fed. Appx. 871, 872 (9th Cir. 2020) (mem.). As recognized by the Ninth Circuit, the Supreme Court of the United States in "Buckman . . . left the door open to state-law claims 'parallel' to federal requirements." McClellan v. I-Flow Corp., 776 F.3d 1035, 1040 (9th Cir. 2015); see Davidson v. Sprout Foods, Inc., 106 F.4th 842, 849 (9th Cir. 2024), discussing Buckman Co. v. Plaintiffs' Legal Committee, 531 U.S. 341 (2021). To avoid preemption, "[t]he plaintiff must be suing for conduct that *violates* the FDCA (or else his claim is expressly preempted [ ]) but the plaintiff must not be suing *because* the conduct violates the FDCA (such a claim would be impliedly preempted under Buckman)." Perez v. Nidek Co., Ltd., 711 F.3d 1109, 1120 (9th Cir. 2013) (citation omitted) (emphasis in original).

The upshot of the regulations and the Acne Monograph, described above, is that a drug that complies with *all* monograph requirements is not misbranded. 21 C.F.R. § 330.10(a)(1) ("The Commissioner shall . . . evaluate the safety and effectiveness of OTC drugs, to review OTC drug labeling, and to advise him on the promulgation of monographs establishing conditions under which OTC drugs are generally recognized as safe and effective and not misbranded"). The Acne Monograph lists BPO as a permitted active ingredient. U.S. Food & Drug Admin., Over-the-Counter (OTC) Monograph M006: Topical Acne Drug Products for Over-the-Counter Human Use; see also 21 C.F.R. § 333.310(a); 21 C.F.R. § 333.350(c)(4). Some courts have observed that the FDA's Monograph "allows [topical acne drugs] to be formulated with the active ingredient [BPO] and does not require disclosure that [BPO] may degrade into [benzene]." Williams v. Galderma Laboratories, L.P., No. 24 CV 2222, 2024 WL 4213220, at *3 (N.D. Ill. Sept. 17, 2024), quoting Truss v. Bayer Healthcare Pharms. Inc., No. 21 CV 9845 (VB), 2022 WL 16951538, at *4 (S.D.N.Y. Nov. 15, 2022); see Mut. Pharm. Co. v. Bartlett, 570 U.S. 472, 488-90 (2013). That said,

as mentioned above, the monograph itself requires that the product follow "each general condition" in 21 C.F.R. § 330.1.

**2. Preemption and Misbranding Theory**

The Court begins with the parties arguments regarding misbranding. Essentially, this issue boils down to two sides. Walmart believes that by complying with the Acne Monograph, it has no other duty under the FDCA and requiring that it do anything more in terms of branding would be preempted under 21 U.S.C. § 379r. Plaintiffs assert that the Acne Monograph itself requires Walmart to comply with other general labeling requirements of the FDCA. Upon consideration of the parties' refined arguments and authority, the Court is persuaded that although the Acne Monograph contains certain requirements, Walmart is subject to Chapter V of the FDCA, which covers general labeling requirements. In order to arrive at this conclusion, the Court takes a tour into the interlocking statutory framework.

To begin, the Court quotes, in relevant part, the Acne Monograph:

> An over-the-counter acne drug product in a form suitable for topical application is generally recognized as safe and effective and is not misbranded if it meets each of the conditions in this subpart **<u>and</u>** each general condition established in § 330.1 of this chapter.

21 C.F.R. § 333.301(a) (emphasis added).

In turn, § 330.1 provides

> An over-the-counter (OTC) drug listed in this subchapter is generally recognized as safe and effective and is not misbranded if it meets each of the conditions contained in this part and each of the conditions contained in any applicable monograph. Any product which fails to conform to each of the conditions contained in this part and in an applicable monograph is liable to regulatory action.
>
> * * *
>
> The product is labeled in compliance with chapter V of the Federal Food, Drug, and Cosmetic Act (the act) and subchapter C et seq. of this chapter, including the format and content requirements in § 201.66 of this chapter. An OTC drug product that is not in compliance with chapter V and subchapter C, including § 201.66 of this chapter, is subject to regulatory action.

21 C.F.R. § 330.1(c)(1).

And under Chapter V, "[a] drug or device shall be deemed to be misbranded . . . [i]f its

labeling is false or misleading in any particular" or "[i]f it is dangerous to health when used in the dosage or manner, or with the frequency or duration prescribed, recommended, or suggested in the labeling thereof." 21 U.S.C. §§ 352(a)(1), (j).

With the foregoing laid out, the Court finds it plain that compliance with the Acne Monograph includes meeting "each general condition established in § 330.1 of this chapter." 21 C.F.R. § 333.301(a). Moreover, § 330.1(c)(1) expressly incorporates Chapter V of the FDCA, which covers general misbranding. Thus, with this understanding, it does not appear that a misbranding theory, based on Chapter V of the FDCA, is expressly preempted by the Acne Monograph. See Rutledge v. Walgreen Co., ___ F.4th ___, 2026 WL 2015284 (2d Cir. July 13, 2026) (discussing that in context of Internal Analgesic, Antipyretic, and Antirheumatic Drug Products monograph that incorporates § 330.1, "The IAAA monograph sets forth various labeling requirements. . . . The monograph does not, however, expressly prohibit additional warnings not specified therein.").

Walmart's only real response to this is citing to the preemption statute itself, which states in relevant part:

> . . . no State or political subdivision of a State may establish or continue in effect any requirement— . . . that is different from or in addition to, or that is otherwise not identical with, a requirement under this chapter [*i.e.*, the FDCA]."

21 U.S.C. § 379r(a)(2).

This appears to get Walmart nowhere because the Acne Monograph itself requires compliance with each general condition established in § 330.1, which in turn incorporates Chapter V labeling requirements.

Indeed, two recent district courts to examine this issue have sided with Plaintiffs' position here. In In re Target Corporation BPO Sales and Marketing Litigation, the district court noted that various district courts had held that a misbranding theory of liability was preempted by § 379r but that "most courts to have addressed this issue stop[ped] with the monograph." No. 24-cv-1323 (ECT/JFD), 2026 WL 145824, at *10 (D. Minn. Jan. 20, 2026). In reviewing the cases cited by the parties, including this Court's previous findings and recommendations, the In re Target court

observed that in the caselaw

> none addresses the regulations' additional requirement that, to be 'not misbranded,' an OTC product's labeling must also comply with 21 C.F.R. § 330.1, including Chapter V's more general proscription against 'false or misleading' labeling, 21 U.S.C. § 352(a)(1). And no reason or explanation has been identified to show why the monograph might trump § 352(a)(1)'s more general requirement.

Id.

The Court agrees with In re Target that a theory of misbranding, pursuant to state-law, *may* sufficiently parallel the FDCA's requirements under Chapter V. Plaintiffs allege that benzene is present in Walmart BPO products and that benzene causes adverse health consequences. Accepting those allegations as true, the Acne Monograph/FDCA plausibly would have required Walmart to disclose the presence of benzene on the BPO products' labeling.

Walmart's attempt to distinguish In re Target is unpersuasive. Walmart argues that the court in In re Target did not apply "the express preemption analysis that this Court and the weight of authority have followed." (ECF No. 69-1, p. 10.) That, however, is patently untrue. The In re Target court thoughtfully discussed the Acne Monograph, § 379r, and related provision of the FDCA in coming to its conclusion. 2026 WL 145824, at *9-*10. Next, Walmart contends that reasoning of In re Target is circular and that the court should have focused on "whether the claims, if successful, would impose requirements 'different from or in addition to' federal law." ECF No. 69-1, p. 10.) Yet, as discussed above, a requirement of the Acne Monograph (and the FDCA) is that an OTC acne product must also comply with "general condition established in § 330.1 of this chapter." 21 C.F.R. § 333.301(a). Thus, the general labeling requirements of Chapter V do not seem to be "different or in addition to" federal law. Indeed, if Walmart's view were correct, then the clause "and each general condition established in § 330.1 of this chapter," would seemingly be surplusage.

Walmart's last gambit is to suggest that In re Target erred because "[t]his interpretation would eviscerate the preemption framework Congress established in Section 379r." (ECF No. 69-1, p. 11.) "If plaintiffs could circumvent express preemption simply by invoking Section 352's general prohibition on 'misleading' labels, the monograph system—and Section 379r's preemption

provision—would be rendered meaningless." (Id.) "If all BPO products are inherently 'adulterated' because BPO degrades into benzene, then FDA's determination that BPO is 'generally recognized as safe and effective' would be rendered meaningless." (ECF No. 76, p. 4.) The Court is not convinced. Again, the Acne Monograph itself, including that such a drug is generally recognized as safe and effective and is not misbranded, requires compliance with general labeling under Chapter V. That said, though the Court agrees with Plaintiffs insofar as their theory of misbranding is not preempted generally, such claims must still be based on exact state-law parallels of the relevant FDCA statute(s).

Next, in Mitchell v. Kenvue, Inc., the district court noted the divide between other courts and the approach taken in In re Target. No. 24-cv-4109 (GC) (JBD), 2026 WL 509400, at *13 (D.N.J. Feb. 24, 2026). As the Court analyzed above, the Mitchell court observed that "the Acne Monograph itself also recognizes that its labeling requirements are subject to Chapter V of the FDCA." Id., citing 21 C.F.R. §§ 333.301(a), 333.350(b). Moreover, the Mitchell court also noted that "[a]lthough Plaintiffs' Chapter V misbranding theory is not preempted, Plaintiffs must still allege that their claims are cognizable under parallel state law," which the Court finds to be true here as well. Id. at *14.

Walmart's only factual distinction offered in Mitchell does not negate that court's preemption analysis. Walmart observes that in Mitchell the products at issue were recalled by the FDA due to confirmed benzene contamination. (ECF No. 69-1, p. 11 n.11.) Yet, Walmart does not connect that fact, which seemingly gets to the issue of failure to state a claim, with anything in the Mitchell court's preemption analysis. More significantly for that case's disposition, the court in Mitchell found that the plaintiffs had not adequately alleged parallelism to the FDCA in their state-law claims. 2026 WL 509400, at *14.

Following taking the matter under submission, Walmart alerted the Court to the recent Supreme Court decision Monsanto Co. v. Durnell, 609 U.S. ___, 146 S. Ct. 2001 (2026).[4] The

[4] Under the Court's Local Rules, a notice of supplemental authority is warranted without prior Court approval and "may contain a citation to the new authority but may not contain additional argument on the motion." L.R. 230(m)(2). Accordingly, the Court has considered the parties notices where appropriate herein. (See ECF Nos. 78, 80, 81.) The Court observes that the Local Rules do not contemplate oppositions or objections to a notice of supplemental authority, which the Court observes should not have been filed without leave of the Court. (ECF Nos. 79, 82.)

Court has reviewed the case and finds that it is not apposite to the case at bar. Critically, Durnell did not involve the interplay between a monograph and preemption statute. Rather, in Durnell—a case involving pesticides under the Federal Insecticide, Fungicide, and Rodenticide Act—the issue before the Court involved only a preemption statute. 146 S. Ct. at 2005-06. As relevant here, the preemption statute in that case provided the following:

> **(a) In general**
> A State may regulate the sale or use of any federally registered pesticide or device in the State, but only if and to the extent the regulation does not permit any sale or use prohibited by this subchapter.
>
> **(b) Uniformity**
>
> Such State shall not impose or continue in effect any requirements for labeling or packaging in addition to or different from those required under this subchapter.

7 U.S.C. § 136v(a), (b).

Similar here, the plaintiff in Durnell brought a failure to warn claim arguing that the defendant's product could be carcinogenic. 146 S. Ct. at 2006. Essentially, the Court observed that the plaintiff's state tort claim would require the defendant to add a cancer warning to its product's label even though federal law required the defendant to use the EPA-approved label without a cancer warning. Id. Because the plaintiff's state tort claim would impose a pesticide labeling requirement "in addition to or different from" the label required by EPA, the Supreme Court held that this claim was expressly preempted. Id.

As should be apparent, subsection (b) of § 136v does not contain a requirement like the Acne Monograph that each product be also in compliance with "each general condition established in § 330.1 of this chapter." 21 C.F.R. § 333.301(a). Furthermore, the relevant preemption statute here does not include explicit preemption of labeling or packing requirements *in toto*. 21 U.S.C. § 379r. In addition to this critical distinction in statutory language, the Supreme Court also noted in Durnell that there is an entirely different process regarding labeling in cases involving pesticide—namely, the EPA must approve a pesticide's label. Durnell, 146 S. Ct. at 2010. Moreover "[a]fter EPA approves a pesticide's label at registration, manufacturers are legally *required* to use that label—unless and until EPA approves or requires a label change and amends the pesticide's

registration." Id. (emphasis in original). The Court thus summarized that "federal law require[d] [the defendant] to sell [the product] with the label that EPA approved at the initial registration and that EPA has subsequently re-approved on multiple occasions—that is, the label without a cancer warning." Id. at 2011. Though a case involving the discussion and application of preemption principles, Durnell is not persuasive.

The Court finds that Plaintiffs' misbranding claim is not categorically preempted.

**3. Preemption and Adulteration Theory**

Plaintiffs argue that they have pleaded an adulteration theory of contamination under 21 U.S.C. § 351(a)(1), § 351(b), and § 351(a)(2)(B). In order to understand these theories, the Court again begins with the relevant statutes.

> A drug or device shall be deemed to be adulterated—
>
> **(a) Poisonous, insanitary, etc., ingredients; adequate controls in manufacture**
>
> (1) If it consists in whole or in part of any filthy, putrid, or decomposed substance; . . . or
>
> [(2)](B) if it is a drug and the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding do not conform to or are not operated or administered in conformity with current good manufacturing practice to assure that such drug meets the requirements of this chapter as to safety and has the identity and strength, and meets the quality and purity characteristics, which it purports or is represented to possess . . . .

21 U.S.C. §§ 351(a)(1), (a)(2)(B); (see ECF No. 66, ¶ 131.).

> **(b) Strength, quality, or purity differing from official compendium**
>
> If it purports to be or is represented as a drug the name of which is recognized in an official compendium, and its strength differs from, or its quality or purity falls below, the standard set forth in such compendium. Such determination as to strength, quality, or purity shall be made in accordance with the tests or methods of assay set forth in such compendium, except that whenever tests or methods of assay have not been prescribed in such compendium, or such tests or methods of assay as are prescribed are, in the judgment of the Secretary, insufficient for the making of such determination, the Secretary shall bring such fact to the attention of the appropriate body charged with the revision of such compendium, and if such body fails within a reasonable time to prescribe tests or methods of assay which, in the judgment of the Secretary, are sufficient for purposes of this paragraph, then the Secretary shall promulgate

> regulations prescribing appropriate tests or methods of assay in accordance with which such determination as to strength, quality, or purity shall be made. No drug defined in an official compendium shall be deemed to be adulterated under this paragraph because it differs from the standard of strength, quality, or purity therefor set forth in such compendium, if its difference in strength, quality, or purity from such standard is plainly stated on its label. Whenever a drug is recognized in both the United States Pharmacopœia and the Homœopathic Pharmacopœia of the United States it shall be subject to the requirements of the United States Pharmacopœia unless it is labeled and offered for sale as a homœopathic drug, in which case it shall be subject to the provisions of the Homœopathic Pharmacopœia of the United States and not to those of the United States Pharmacopœia.

21 U.S.C. § 351(b); (see ECF No. 66, ¶¶ 78, 158, 161, 163.)

At times, the parties have argued past each other. For example, Walmart generally contends that Plaintiffs' adulteration theory must fail because it is preempted. In opposition, Plaintiffs gave clarification that their adulteration theory is actually a set of three theories, all of which support finding that preemption does not apply. In reply, Walmart doubles down, arguing that the issue of preemption and an adulteration theory is straightforward (and addressing Plaintiffs' USP theory).

In order for clarity, the Court takes each theory in turn, summarizing Plaintiffs' theories before analyzing whether preemption applies.

**a. Theory of Adulteration: § 351(b) (and the USP)**

The Court begins with Plaintiffs' theory of adulteration based on § 351(b), which provides that a drug is adulterated "[i]f it purports to be or is represented as a drug the name of which is recognized in an official compendium, and its strength differs from, or its quality or purity falls below, the standard set forth in such compendium. . . ." 21 U.S.C. § 351(b). Plaintiffs assert that the USP is an official compendium and therefore, the requirements in the USP are 'incorporated' into the FDCA. In order to understand this theory, the Court once more outlines the pathway below.

Title 21 U.S.C. § 321(j) provides:

> The term 'official compendium' means the official United States Pharmacopœia, official Homœopathic Pharmacopœia of the United States, official National Formulary, or any supplement to any of them.

Of course, the USP, or United States Pharmacopœia, is explicitly listed in § 321(j).

Plaintiffs then cite to USP General Notice 5.60.20, which provides:

> All USP and NF articles are subject to relevant control of residual solvents, even when no test is specified in the individual monograph. If solvents are used during production, they must be of suitable quality. In addition, the toxicity and residual level of each solvent shall be taken into consideration, and the solvents limited according to the principles defined and the requirements specified in Residual Solvents ⟨467⟩, using the general methods presented therein or other suitable methods.

In turn, USP Chapter ⟨467⟩, Residual Solvents, provides "[f]or pharmacopeial purposes, residual solvents in pharmaceuticals are defined as organic volatile chemicals that are used or produced in the manufacturing of drug substances, excipients, or dietary ingredients, or in the preparation of drug products or dietary supplement products." (ECF No. 74-5, p. 2.) USP Chapter ⟨467⟩, Residual Solvents, Table 2, states that benzene is a solvent with a "concentration limit (ppm)" of 2 because it is a "carcinogen." (Id. at p. 5.)

In short, Plaintiffs contend that the FDCA incorporates the USP, and the USP includes Chapter ⟨467⟩, which provides a limit of 2 ppm to benzene.

Walmart disagrees, arguing that USP Chapter ⟨467⟩ "applies only in narrow circumstances and relates to the use of solvents, such as benzene, where the use is unavoidable in order to produce a drug product with a significant therapeutic advance." (ECF No. 69-1, p. 7.) Walmart offers that benzene is not an intentional ingredient or solvent used in the manufacturing of BPO products, so the 2-ppm limit does not apply here.

This Court previously found that "[P]laintiffs [did] not allege any binding regulatory benzene safety threshold, 2 ppm or otherwise, applicable to defendant's BPO products." Navarro, 2026 WL 266374, at *1. Plaintiffs have now identified a pathway to incorporate the 2-ppm limit, which the Court must analyze. The Court begins with the language of the USP before returning to the language of the statute.

Regarding the USP, the key language (at first blush) is the "definition" of a residual solvent, which is "organic volatile chemicals that are used or produced in the manufacturing of drug substances . . . ." The Court notes that there are no allegations that Walmart used benzene as a solvent in its manufacturing of its BPO products. Next, though nuanced, the Court uses the common

definitions of the words "produce" and "manufacturing" and finds that the phrase "produced in the manufacturing" to be "to [have] cause[d] to have existence or to happen"[5] in "the act or process of producing something."[6] Again, there are no allegations that the manufacturing of BPO creates benzene as an immediate byproduct; rather, the allegations in the operative complaint clearly outline that the principle worry of BPO is that it *degrades* into benzene *over time*. Plaintiffs eschew this, stating that Walmart has taken the position that "[it] can escape liability by claiming it did not intend to add a useless carcinogen to its products." (ECF No. 74, p. 9.) But this premise this seemingly misreads USP Chapter ⟨467⟩, Residual Solvents, because that Chapter explicitly recognizes that benzene *may* be used as a *solvent* and limits its concentration following such use.

Importantly, however, Plaintiffs have directed the Court to a section of USP Chapter ⟨467⟩ that discusses the Classification of Residual Solvents by Risk Assessment. (ECF No. 74-5, p. 3.) In that section, it is noted that there are three potential sources of residual solvents in pharmaceutical drug products. As relevant here, the first category, "drug substance or dietary active ingredient," states that "[p]otential solvent sources include their use or formation during the synthesis or purification of the drug substance; their presence in raw materials or reagents used in their synthesis; or *degradation of the drug substance*." (Id.) (emphasis added).[7] In other words, it appears that USP Chapter ⟨467⟩ explicitly contemplates drug degradation as a source of residual solvents. Therefore, there is an ambiguity between USP Chapter ⟨467⟩'s apparent definition of "residual solvents" and later discussions explicitly including degradation. On a motion to dismiss, the Court must view the facts in the light best for the nonmovant, and therefore, the Court finds that USP Chapter ⟨467⟩ arguably covers degradation of the drug substances.

With this finding, the Court is required to address Walmart's statutory argument, that even assuming the USP Chapter ⟨467⟩ creates a 2-ppm limitation in the degradation of BPO, § 351(b)

[5] "Produce." Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriamwebster.com/dictionary/produce. (last accessed 4 Jun. 2026).

[6] "Manufacture." Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/manufacture. (last accessed 4 Jun. 2026).

[7] Plaintiffs also cite to a third category on "formation," but that section covers potential solvent sources "during the official product manufacturing process," and not degradation.

does not generally incorporate the USP generally as Plaintiffs have posited. In support, Walmart contends that § 351(b) provides that a drug is adulterated if it is "represented" as a drug recognized in an official compendium, but its "strength differs from, or its quality or purity falls below, the standard set forth in such compendium." 21 U.S.C. § 351(b). Therefore, Walmart contends that § 351(b) is concerned with drugs whose strength, quality, or purity are misrepresented—not with drugs that allegedly contain a contaminant.

Plaintiffs counter that by alleging that the BPO products have degraded into benzene in excess of 2 ppm, they have adequately alleged that Walmart's BPO products are adulterated because the *purity* of the BPO is below the standard set in the USP.

Though a close call, the Court is persuaded with Plaintiffs' argument. The Court takes Walmart's position that § 351(b) is concerned about the drug strength or quality being misrepresented. However, the Court agrees with Plaintiffs that the term "purity" is also used. Thus, condensing the plain words of the statute: "a drug is adulterated . . . if . . . its purity falls below, the standard set forth in [the USP]." 21 U.S.C. 351(b). Walmart's attempt to focus the Court on a drug's purity at the time of manufacturing does not seem to be contemplated by the statute. Rather, it appears that if an applicable drug falls below the purity requirements of the USP, the statute states that such drug is adulterated.

Plaintiffs have made such allegations, and therefore, the Court is persuaded that this theory of adulteration is not preempted.

**b. Theory of Adulteration: § 351(a)(2)(B) and cGMPs**

Notwithstanding the Court's previous determination that claims based on violations of cGMPs are "not categorically preempted," Navarro, 2025 WL 3563471, at *14, Walmart argues now that the "practical effect of accepting Plaintiffs' allegations would be to require Walmart to either reformulate the Products to prevent alleged benzene formation or withdraw from the market entirely—outcomes that are preempted by the 2020 Monograph." (ECF No. 69, p. 12.) In its reply, Walmart relies on only, and again, the preemption statute 21 U.S.C. §379r.

Plaintiffs first address failure to state a claim under cGMPs (which the Court addresses later herein) before discussing Walmart's renewed preemption argument. (ECF No. 74, pp. 16.)

Essentially, Plaintiffs explain that the operative complaint does not allege that Walmart will be *required* to anything as Walmart has suggested. Rather, Plaintiffs again explain how in their view a BPO Product is not GRASE if it is not manufactured in compliance with the cGMPs. Plaintiffs then explain that Walmart's fundamental argument—that it need not comply with cGMPs because the "outcomes" of compliance (like reformulation or withdrawal) are "different from" Monograph requirements—is a fallacy. In other words, Plaintiffs suggest that requiring Walmart to follow the law does not equate preemption. Moreover, Plaintiffs note that other manufacturers have managed to produce BPO products without excess benzene. (See ECF No. 66, ¶¶ 111, 104, 112.)

In reply, Walmart again attempts to train the Court's eye on the "practical outcome" of allowing Plaintiff's cGMP claims to go forward—that these claims would require more of Walmart than the Acne Monograph requires.

The Court again finds that Plaintiffs continue to have the better argument. To begin with, it does not appear that Walmart disputes the Court's previous finding. Rather, Walmart, without citing precedent, asks the Court to look at outcomes for Walmart should Plaintiffs' claims be meritorious. Of course, in order to follow this logic, Walmart's argument relies on the assumption that the Acne Monograph requires only compliance with itself, and only its first clause. But as explained in detail above, the Court has determined that the Acne Monograph requires compliance not only with the Monograph but "each general condition established in § 330.1." In turn, a drug is deemed adulterated "if it is a drug and the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding do not conform to or are not operated or administered in conformity *with current good manufacturing practice* to assure that such drug meets the requirements of this chapter as to safety and has the identity and strength, and meets the quality and purity characteristics, which it purports or is represented to possess." 21 U.S.C. § 351(a)(2)(B) (emphasis added).

To be sure, the Court previously found that, based on the arguments before it, that requiring a label, based on solely the Acne Monograph, appeared to be preempted by 21 U.S.C. § 379r(a) because it would require a reformulation of the BPO product. Navarro, 2025 WL 3563471, at *13. Yet, this time around, Plaintiffs have plausibly alleged that the Acne Monograph also requires

compliance with Chapter V general labeling requirements. That Walmart might need to reformulate its BPO products to be in compliance with the Acne Monograph itself does not appear to be "in addition" to federal law, but rather, as Plaintiffs argue, merely acting in compliance with the law.

Thus, the Court again finds that Plaintiffs cGMP claims are not categorically preempted.

**c. Theory of Adulteration: § 351(a)**

This final theory relies on § 351(a), which provides that "[i]f [a drug] consists in whole or in part of any filthy, putrid, or decomposed substance," then it is adulterated. In support of this theory, Plaintiff highlights that they have alleged that BPO degrades into benzene and that the FDA has even issued recalls and guidance regarding benzene in BPO products generally. (ECF No. 74, p. 3, citing ECF No. 66, ¶¶ 82, 85, 169.) Thus, Plaintiffs argue that that the extent they raise parallel claims based on this definition of adulteration, this theory is not preempted.

Walmart's argument is primarily that this theory is a "repackaged warning claim." (ECF No. 76, p. 1-2.) Because the Court has revised its previous determination with regard to Plaintiffs' misbranding claim, the Court agrees with Plaintiffs that this theory—for substantially similar reasons discussed above—is not preempted.

Again, the Court is not persuaded by Walmart's contention that were Plaintiffs successful, Walmart would be required to do something "in addition to" federal law. Rather, this theory is straightforward: because the BPO products allegedly contained benzene, they were adulterated. The Court has already explained how the Acne Monograph includes compliance with itself and each general condition established in § 330.1, which includes compliance with § 351(a).

This theory too is not preempted.

**4. Parallelism**

A significant issue hinted at but not fully briefed by the parties is parallelism. As a reminder, § 379r does not preempt claims under state law that impose identical or "parallel" requirements to FDA regulations. <u>Riegel v. Medtronic</u>, 552 U.S. 312, 330 (2008). Upon review of the operative complaint, it appears that Plaintiffs have alleged statutes that support parallel claims for their theories of adulteration, misbranding, and violations of cGMPs. (ECF No. 66, ¶ 177.) Walmart did dispute parallelism in either its motion or reply.

Accordingly, to the extent Plaintiffs' claims require parallel state statutes, the Court finds that Plaintiffs have sufficiently alleged as such. Any such nuance on whether a statute is actually parallel may nonetheless be raised in a later dispositive motion.

* * *

In sum, the Court is now persuaded that Plaintiffs have alleged that none of their theories of liability are preempted and that there are parallel state statutes that support such potential claims. Thus, the Court will recommend that Walmart's motion to dismiss be denied as to preemption.

**C. Failure to State a Claim: Rule 8 Plausibility and Rule 9(b)**

Having addressed the threshold arguments regarding preemption, the Court next addresses Walmart's argument that Plaintiffs have nonetheless failed to state a claim for violations of cGMPs. (ECF No. 69-1, pp. 14-18.) As Walmart notes, Plaintiffs have now identified five categories of cGMPs that Walmart has purportedly violated: product specifications, temperature controls, stability testing, treatment of contaminated batches, and expiration dates. (See ECF No. 66 ¶ 153.) Notwithstanding this narrowing of cGMPs, Walmart argues that Plaintiffs have failed to allege facts that Walmart violated the cGMPs at issue, as well as failed to allege such violations resulted in all the BPO products at issue being contaminated with benzene at levels exceeding 2 ppm. (ECF No. 69-1, p. 15.)

Plaintiffs oppose, arguing that they have now "specifically alleged how [Walmart] violated cGMP[s]: Defendant did nothing to control for the formation of benzene in the Products, despite being required to do so by cGMP." (ECF No. 74, pp. 9-10.) Essentially, Plaintiffs assert that they have sufficiently alleged that Walmart "was required to test and control for a known degradant (benzene) and reject noncompliant batches but failed to do so." (Id. at p. 10.) Plaintiffs also direct the Court to allegations that Walmart was required to and failed to comply with storage and stability testing. (Id.) The Court agrees with Plaintiffs.

The parties seemingly agree that this issue seemingly boils down to the allegations outlined in paragraph 153 of the operative complaint, which the Court quotes below:

> Thus, upon information and belief, based on the high levels of benzene discovered in testing and the chemical instability of Defendant's formulation, Defendant violated the following

California state law requirements, which parallel and incorporate federal cGMPs (as expressly incorporated into California law by the Sherman Food, Drug, and Cosmetic Law, Cal. Health & Safety Code §§ 109875 and 110100):

**a. Failure to Establish Scientifically Sound Specifications (21 C.F.R. §§ 211.160, 211.87, 21 C.F.R. § 211.100).**

Defendant was required to establish and/or follow 'test procedures, or other laboratory control mechanisms' to 'assure that components' (including the active ingredient, raw BPO), in-process materials, labeling, and drug products conform to appropriate standards of identity, quality, and purity.' However, Defendant failed to assure component purity for BPO via mandated testing and retesting procedures to assess BPO degradation. Because raw BPO is stable up to 98°C, upon information and belief, Defendant did not establish specifications for raw BPO and did not conduct retesting of BPO, which is known to be 'subject to deterioration' into benzene due to heat exposure during shipping or storage, to ensure they were free from benzene precursors or existing contamination. Moreover, upon information and belief, Defendant failed to establish necessary purity specifications for known degradants. Because it has been known since at least 1936 that the BPO molecule is thermally unstable and degrades into benzene, Defendant had been repeatedly warned by the FDA, and it is required on the FDCA's incorporation of USP <467> standards, Defendant's specifications must include a maximum threshold for benzene formation (2 ppm)—the limit set by the FDA that manufacturers must adopt. Defendant chose not to have any such purity standard for benzene, choosing instead to ignore a known chemical pathway with a mandatory cap in favor of cheaper, less rigorous testing protocols. This failure fundamentally violates the requirement to establish laboratory control mechanisms to assure drug products conform to standards of identity and purity (21 C.F.R. § 211.160(a)-(b), 21 C.F.R. § 211.100) and to retest components subject to deterioration (21 C.F.R. § 211.87).

**b. Failure to Maintain Facilities and Temperature Controls (21 C.F.R. § 211.142).**

CGMPs require the '[s]torage of drug products under appropriate conditions of temperature, humidity, and light so that the identity, strength, quality, and purity of the drug products is not affected,' as required by 21 CFR § 211.142(b). The instability in Defendant's BPO products arises due to, in part, improper manufacturing or holding conditions (e.g., improperly refrigerated shipping or warehouse storage). Upon information and belief, Defendant violated the cGMPs by shipping and holding BPO Products in inadequately refrigerated environments, effectively catalyzing the formation of benzene before the product reached Plaintiffs. Upon information and belief, Defendant did not conduct stability testing satisfactorily, and Defendant's lack of stability testing makes compliance with USP <1079> a physical and legal impossibility. USP <1079> states that environmental controls are 'key' to maintaining drug safety and quality, and that '[t]emperature is one of the most important parameters to control.' USP <1079>

explicitly states that 'drugs must be stored and transported according to predetermined conditions (e.g., temperature) as supported by stability data.' While USP <1079> allows for brief 'temperature excursions' outside of labeled storage conditions, such excursions are only acceptable 'provided that stability data and scientific/technical justification exist' to prove that product safety and quality are not affected.

Because Defendant did not conduct stability testing for benzene formation, upon information and belief, it possesses no 'stability data' or 'scientific/technical justification' to excuse the temperature spikes its products experienced during shipping and storage. Consequently, any temperature excursion—no matter how brief—rendered the BPO Products adulterated because Defendant had no data to ensure that such heat exposure would not trigger the degradation of BPO into benzene. By shipping these products without the refrigerated controls required for a thermally unstable molecule, and without the stability data required by USP <1079> to justify that failure, Defendant directly violated 21 C.F.R. § 211.142.

**c. Failure to Utilize 'Meaningful and Specific' Stability Test Methods (21 C.F.R. § 211.166).**

Federal regulations require drug manufacturers to maintain a written stability testing program using 'reliable, meaningful, and specific test methods.' Defendant's stability testing program omitted testing for benzene and therefore failed to evaluate a known and well-documented degradation pathway of the active ingredient. A stability program that excludes assessment of a purity attribute subject to an established numerical limit is incapable of providing meaningful or specific information regarding product stability and does not satisfy the requirements of 21 C.F.R. § 211.166. By omitting benzene from its stability program, Defendant violated the mandate for 'reliable, meaningful, and specific test methods' (21 C.F.R. § 211.166).

**d. Failure to Test Components, Investigate Unexplained Discrepancies, and Reject Adulterated Lots (§§ 211.84(d), 211.165, 211.192, 211.67, 211.100, 211.110):**

The cGMPs establish a mandatory 'gatekeeper' process to ensure that adulterated drugs never reach consumers. The cGMPs require that each batch be tested prior to release and that any batch showing an unexplained discrepancy or failure to meet specifications be rejected. But, Defendant skipped these mandated tests for the specific batches purchased by Plaintiffs, and illegally released the contaminated batches anyway. First, federal law mandates that for each batch of drug product, there 'shall be appropriate laboratory determination of satisfactory conformance to final specifications' prior to release (§ 211.165(a)). By failing to establish adequate acceptance criteria, control procedures to validate performance of manufacturing processes, or conduct testing for benzene—a known degradant—before release, Defendant could not 'assure that batches of drug products meet each appropriate specification' required for approval and release (§ 211.165(d), § 211.110, § 211.100).

> Second, the Quality Control Unit ("QCU") has an affirmative duty to 'thoroughly investigate' any 'unexplained discrepancy' or failure of a batch to meet specifications, 'whether or not the batch has already been distributed.' Because the instability of BPO and its degradation into benzene is a scientifically documented 'discrepancy,' the QCU's failure to review production records or investigate this degradation pathway constitutes a systemic failure to determine compliance with established procedures (§ 211.192).
>
> Finally, Defendant was required (1) to test or examine sample lots of components—such as active ingredients like BPO—for conformity with all written specifications for purity, strength, and quality before release or sale for use; and (2) to reject sample lots of components that did not meet the written specifications for identity, quality and purity and related tests (§ 211.84). Defendant failed to test its active ingredient BPO for the presence of benzene in violation of the affirmative testing duties mandated by cGMPs and USP <467>. Defendant adequately tested its BPO Products for benzene, it would have discovered that its Products contained benzene at levels above even the FDA's "safe harbor" exception limit of 2 ppm, making the Products illegal to distribute, market, and sell, thus warranting a recall.
>
> **e. Expiration Dates Not Supported by Stability Data (21 CFR § 211.137).**
>
> Defendant is required under cGMPs to ensure that its products meet standards of purity at the time of consumer use, which in turn requires assigning an expiration date supported by stability data. Stability testing must evaluate whether the drug product remains safe and pure throughout its shelf life under all expected distributor and consumer storage, handling, and use conditions, using 'reliable, meaningful, and specific' test methods.
>
> It is well known that chemical ingredients may degrade over time or in response to environmental factors such as temperature, light, moisture, and humidity, and any stability testing demonstrating degradation or formation of toxic byproducts renders the product unfit for sale. This requires an expiration date related to the specific storage conditions on the label.
>
> Defendant's expiration dates are legally invalid because they are not supported by stability testing data showing that the BPO Products remain below 2 ppm benzene when stored over that time period. By omitting benzene from its stability program, Defendant violated the mandate for 'reliable, meaningful, and specific test methods' (21 C.F.R. § 211.166) and the requirement that expiration dates be supported by such data (21 C.F.R. § 211.137).

(ECF No. 66, ¶ 153) (footnotes omitted).

Walmart's argument breaks down into two sub arguments. First, Walmart argues that Plaintiffs have failed to meet the plausibility standard in Rule 8 because their logic undergirding

their claims remains circular. Second, Walmart contends that Plaintiffs have still failed to allege (or support) factual allegations that show "how" Walmart violated the cGMPs, implicating the heightened pleading standard of Federal Rule of Civil Procedure 9(b).[8] The Court finds that these issues here collapse into each other and therefore addresses them together.

To start, the Court observes that in its last findings and recommendations, it was concerned that it seemed as if Plaintiffs had merely listed 23 cGMPs that they then alleged Walmart had violated. In other words, it appeared as if Plaintiffs had thrown spaghetti against the wall, attempting to see what would stick. Navarro, 2025 WL 3563471, at *18. In particular, with such broad pleading, it was unclear to the Court that Plaintiffs had put Walmart on notice of how it had purportedly violated any cGMPs. Id.

In light of the allegations above, as well as the operative complaint generally, the Court is satisfied that Plaintiffs have sufficiently identified cGMPs in a way that puts Walmart on notice of how it allegedly violated such cGMPs. For example, paragraph 153, subsection (a), outlines that Walmart was required to establish and/or follow testing procedures or other laboratory control mechanisms to 'assure that components' (including the active ingredient, raw BPO), in-process materials, labeling, and drug products conform to appropriate standards of identity, quality, and purity.' In other words, Plaintiffs have identified that Walmart allegedly did not establish or follow testing that would confirm the purity of its BPO products. Subsections (c) and (d) likewise invoke specific types of testing procedures not created or implemented. Meanwhile, subsection (b) addresses storage of BPO, and subsection (e) addresses that Walmart's BPO products' expiration dates are not supported by stability testing. (See generally ECF No. 74, pp. 9-10.)

Thus, as the parties are aware, the crux of this motion boils down to the issue of plausibility. In addition to the Valisure study and FDA alerts, Plaintiffs have also included other studies finding benzene in BPO in certain products and not others (ECF No. 66, ¶ 111), demonstrating that it is possible to have a BPO product that does not contain benzene. Significantly, Walmart offers no rebuttal to Plaintiffs' allegation that their counsel had Walmart BPO products independently tested,

[8] Walmart makes a third argument, which is assuming Plaintiffs could plead claims pursuant to violations of cGMPs, these claims would be preempted. The Court has already addressed the preemption issue and therefore will not again address it in this section. (ECF No. 69-1, p. 17.)

which shows such BPO products containing benzene in excess of 2 ppm. (Id. at ¶ 104.) "For example, testing conducted on three (3) of Defendant's Equate Acne Treatment Gel 10% BPO Products purchased in or around May 2024 showed benzene levels of 592.46 ppm (Lot # 0614742), 561.17 ppm (Lot # 0606804), and 626.66 ppm (Lot # 0605012), respectively. This repeated evidence shows Defendant's BPO Products are chemically unstable and adulterated at the time of purchase." (Id.)

Plaintiffs thus explain that "[they] are not alleging that the presence of benzene is proof of cGMP violations; the cGMP violations involve the failure to control for benzene formation or test for benzene in the Products. That such high levels of benzene were then found in Defendant's products simply gives credence to that fact." (ECF No. 74, p. 12.) In other words, Plaintiffs suggest that their allegations sufficiently support an inference that Walmart plausibly violated the identified cGMPs. The Court agrees. Plaintiffs have nudged their claims "across the line from conceivable to plausible." See Iqbal, 556 U.S. at 680. Furthermore, by alleging the "how," Plaintiffs meet Walmart's Rule 9(b) concern.

That Walmart takes issue that some of Plaintiffs allegations are "on information and belief," is not persuasive under the circumstances of this case. "The Twombly plausibility standard . . . does not prevent a plaintiff from pleading facts alleged upon information and belief where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible." Soo Park v. Thompson, 851 F.3d 910, 928 (9th Cir. 2017), quoting Arista Records, LLC v. Doe 3, 604 F.3d 110, 120 (2d Cir. 2010). Because many of the relevant facts here are known only to Walmart, and in light of all the allegations in the operative complaint, the Court concludes that Plaintiffs have pleaded sufficient facts to state plausible claims pursuant to violation of cGMPs. See id.

Walmart's offered precedent is distinguishable or not persuasive. In Ebrahimi v. Mentor Worldwide LLC, the Ninth Circuit, in a memorandum opinion, affirmed the district court's dismissal of the plaintiff's medical device claim. 804 Fed. Appx. 871 (9th Cir. 2020) (mem.). The plaintiff "essentially contend[ed] that the court [could] plausibly infer that [the defendant] must have violated at least one of the FDA's CGMPs by not catching her allegedly defective [breast]

implants." Id. at 872. The Court observed that "mere allegations 'suggesting that [the plaintiff's] particular breast implant[s] w[ere] defective does not show that [the defendant] failed to comply with the FDA's Current Good Manufacturing Practices.'" Id., quoting Weber, 940 F.3d at 1114. As should be apparent, the Court has found that Plaintiffs here have not provided mere allegations suggesting Walmart's BPO was defective and therefore Walmart must have violated cGMPs. In particular, Ebrahimi seemingly involved only one plaintiff with one purportedly defective product. Meanwhile, Plaintiffs have alleged multiple instances of benzene detection in BPO products, via the Valisure study and counsel's independent testing.

In Tripolskiy v. Boston Scientific Corporation, the plaintiff had a subcutaneous implantable cardioverter-defibrillator installed in his chest that was supposed to have an 8.7 year of battery life; however, the device lasted not even four years. No. 23-cv-03775 PA (JCx), 2023 WL 5440783, at *1 (C.D. Cal. June 23, 2023). After visiting his physician, the plaintiff was informed that the device had been recalled due to the battery issue. Id. The plaintiff sued, bringing nine state-law claims (none of which seemingly tied to a state-law parallel statute). Id. The district court observed that the complaint "conclusorily alleges that Defendant's conduct and the [device] did not meet federal standards because the battery prematurely failed and Defendant issued a recall." Id. at *4. Thus, the court found that the plaintiff could not "simply incant the magic words '[defendant] violated FDA regulations' in order to avoid preemption." Id. (internal quotation omitted). In other words, the real issue in Tripolskiy seemingly was the plaintiff's inability to identify a parallel state statute to support that the defendant had violated a cGMP.

Finally, while Walmart cites to Weber, the Court notes that even Weber was decided on summary judgment, not a motion to dismiss. Weber v. Allergan, Inc., 940 F.3d 1106, 1114 (9th Cir. 2019). In any event, the only evidence offered on behalf of the plaintiff in Weber relating to a defective medical device was an expert opinion that "[the plaintiff's] right implant's gel bleed exceeding the amount specified by its product labeling constituted a 'departure from the manufacturer's specifications' and a 'defect.'" Id. at 1113. The Ninth Circuit observed that this "opinion that the implant was defective and malfunctioned is not evidence that [the defendant] deviated from the FDA's pre-market approved procedures. *Res ipsa loquitor* is not enough to

survive MDA preemption." Id. The Court finds this reasoning in line with Ebrahimi, where evidence of one defect was not enough to establish a violation of cGMPs.

Based on the foregoing, the Court will recommend denying this aspect of Walmart's motion to dismiss.

**D. Standing to Pursue Injunctive Relief**

Walmart argues that Plaintiffs lack standing to pursue injunctive relief because "they do not allege that they are likely to suffer imminent and substantial future injury absent an injunction." (ECF No. 69-1, p. 18.) Plaintiffs respond that they have sufficiently alleged standing for injunctive relief, citing relevant portions of the operative complaint. (ECF No. 74, p. 22.) The Court agrees with Plaintiffs.

As expounded upon in Davidson v. Kimberly-Clark Corp., a plaintiff must demonstrate constitutional standing separately for each form of relief requested. 889 F.3d 956, 967 (9th Cir. 2018), citing Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC) Inc., 528 U.S. 167, 185 (2000). For injunctive relief, which is a prospective remedy, the threat of injury must be "actual and imminent, not conjectural or hypothetical." Summers v. Earth Island Inst., 555 U.S. 488, 493 (2009). In other words, the "threatened injury must be certainly impending to constitute injury in fact" and "allegations of possible future injury are not sufficient." Clapper v. Amnesty Int'l USA, 568 U.S. 398, 409 (2013) (internal quotation marks and alteration omitted). Past wrongs, though insufficient by themselves to grant standing, are "evidence bearing on whether there is a real and immediate threat of repeated injury." City of Los Angeles v. Lyons, 461 U.S. 95, 102 (1983) (internal quotation marks omitted). Where standing is premised entirely on the threat of repeated injury, a plaintiff must show "a sufficient likelihood that he will again be wronged in a similar way." Id. at 111. In determining whether an injury is similar, courts "must be careful not to employ too narrow or technical an approach. Rather, [courts] must examine the questions realistically: [courts] must reject the temptation to parse too finely, and consider instead the context of the inquiry." Armstrong v. Davis, 275 F.3d 849, 867 (9th Cir. 2001), *abrogated on other grounds by* Johnson v. California, 543 U.S. 499 (2005).

In resolving a split among district courts, the Davidson Court held "that a previously

deceived consumer may have standing to seek an injunction against false advertising or labeling, even though the consumer now knows or suspects that the advertising was false at the time of the original purchase, because the consumer may suffer an 'actual and imminent, not conjectural or hypothetical' threat of future harm." 889 F.3d at 969, quoting Summers, 555 U.S. at 493. Importantly, "[k]nowledge that the advertisement or label was false in the past does not equate to knowledge that it will remain false in the future." Id. at 969-70. "In some cases, the threat of future harm may be the consumer's plausible allegations that she will be unable to rely on the product's advertising or labeling in the future, and so will not purchase the product although she would like to." Id. at 970. "In other cases, the threat of future harm may be the consumer's plausible allegations that she might purchase the product in the future, despite the fact it was once marred by false advertising or labeling, as she may reasonably, but incorrectly, assume the product was improved." Id.

Here, Plaintiff has alleged that "in the future, [they would] be willing to purchase the Products, if assured that they were not adulterated and complied with federal manufacturing and holding standards." (ECF No. 66, ¶ 46.) This seems to comport with the Ninth Circuit's second example in Davidson noted above.

Walmart attempts to distinguish Davidson, arguing that the plaintiff in Davidson would have had no way to know if the product at issue was truly "flushable." Walmart asserts that here, BPO is listed as the active ingredient and that Plaintiffs "know—based on their own allegations, including the Valisure report—that BPO allegedly degrades into benzene. There is no hidden attribute. Plaintiffs cannot be 'fooled again' because the very information they claim was concealed is now know to them." (ECF No. 76, p. 9.) However, this logic was squarely addressed and rejected in Davidson. "Knowledge that the advertisement or label was false in the past does not equate to knowledge that it will remain false in the future." 889 F.3d at 969-70.

Once more, Plaintiffs have alleged that BPO degrades into benzene (either as a direct result of violation of cGMPs or otherwise). Plaintiffs allege that they would purchase Walmart's BPO products in the future if the products were not adulterated (*i.e.*, contain benzene). Assuming Plaintiffs allegations are true, Plaintiffs would have no way to know whether in the future

Walmart's BPO products contained benzene (outside of independently testing every bottle they purchase). Finally, Walmart's argument that Plaintiffs' allegation about future purchasing as conclusory is incorrect in light of all the allegations supporting that Walmart's BPO products plausibly contain BPO and that Plaintiffs purchased the products.

For the foregoing reasons, the Court will recommend denying this aspect of Walmart's motion to dismiss.

**E. State Law Claim: Breach of Implied Warranty**

"The California Commercial Code implies a warranty of merchantability that goods '[a]re fit for ordinary purposes for which such goods are used.'" Birdsong v. Apple, Inc., 590 F.3d 955, 958 (9th Cir. 2009), quoting Cal. Com. Code § 2314(2)(c). The implied warranty "provides for a minimum level of quality." Am. Suzuki Motor Corp. v. Superior Court, 37 Cal. App. 4th 1291, 1296, 44 Cal. Rptr. 2d 526 (Cal. Ct. App. 1995). A breach of the warranty of merchantability occurs if the product lacks "even the most basic degree of fitness for ordinary use." Mocek v. Alfa Leisure, Inc., 114 Cal. App. 4th 402, 406, 7 Cal. Rptr. 3d 546 (Cal. Ct. App. 2003), citing Cal. Com. Code § 2314(2).

Outside the realm of warranties regarding automobiles, precedent from the California courts is thin in this area of the law. That said, the Court finds Hauter v. Zogarts to be instructive. 14 Cal. 3d 104, 534 P.2d 377 (Cal. 1975) (In Bank). In Hauter, the defendants manufactured "a training device designed to aid unskilled golfers improve their games." Id. at 108. A mother purchased the device from the defendants' catalogue and gave it to her minor son, the plaintiff. Id. The label on the shipping carton and cover of the instructions stated that players are to "'drive the ball with full power' and further state[d]: 'COMPLETELY SAFE BALL WILL NOT HIT PLAYER.'" Id. at 109. The plaintiff would be seriously injured when using the device and thereafter sued bringing, as relevant here, an implied warranty claim. Id.

The California Supreme Court began by noting that "[i]nto every mercantile contract of sale the law inserts a warranty that the goods sold are merchantable, the assumption being that the parties themselves, had they thought of it, would specifically have so agreed." Id. at 117 (internal quotation and citation omitted). "Consequently, defendants' liability for an implied warranty does not depend

upon any specific conduct or promise on their part, but instead turns upon whether their product is merchantable under the code." Id. In holding that the device was not fit for its ordinary purpose, the Court noted that the defendants' had argued that their product was indeed safe "when the ball is hit squarely." Id. at 113; see id. at 118 (incorporating the Court's false representation analysis in its implied warranty analysis). The Court then observed that "even though certain dangers are inherent in playing golf, the risk that the golfer's own ball will wrap itself around his club and strike the golfer on the follow-through is not among those dangers. [The plaintiff's] injury stemmed from a risk inherent in defendants' product, not a risk inherent in the game of golf." Id. Thus, the Court held that the trial court had not erred in granting judgment notwithstanding the verdict to the plaintiff regarding his claim of implied warranty. Id. at 120.

With that, the Court begins by straightening out some of the legal standards Walmart has cited from the federal district courts. Sitting in diversity, it is axiomatic that this Court must give deference and respect to the California courts with a relentless endeavor of not overstating what the law is. The Court begins with Walmart's citation to Tietsworth v. Sears, 720 F. Supp. 2d 1123 (N.D. Cal. 2010), where the court quoted another district court, stating "[t]he mere manifestation of a defect by itself does not constitute a breach of the implied warranty of merchantability. Instead, there must be a *fundamental* defect that renders the product unfit for its ordinary purpose." Id. at 1142 (emphasis added). Tietsworth relied on Stearns v. Select Comfort Retail Corp., where the district court stated, "there must be a *fundamental* defect that renders the product unfit for its ordinary purpose" and then cited the California Court of Appeal's opinion American Suzuki. No. 08-cv-02746-JF, 2009 WL 1635931 (N.D. Cal. June 5, 2009) (emphasis added).

The Court has read American Suzuki, and the word "fundamental" does not appear in the opinion. See 37 Cal. App. 4th 1291. Rather, American Suzuki concerned plaintiffs who alleged that due to a vehicle's design it was prone to deadly roll-over accidents, and "because of this design flaw the [vehicle was] unfit for its 'ordinary purpose' which [was] to 'transport people and cargo on the highways and byways of this [s]tate.'" Id. at 1293-94. Significantly, the plaintiffs "did not allege they had been injured personally or had incurred any consequential property damage as a result of the design defect. They sought damages 'measured by the cost of repairing the inherent

safety defect in the [vehicle].'" Id. at 1294.

The court noted that the plaintiffs' theory on the implied merchantability claim was that "in California the test of merchantability is not whether the product in question is capable of performing as warranted, but whether it is free of all speculative risks, safety-related or otherwise." The Court of Appeal was not persuaded. Indeed, the American Suzuki court addressed the plaintiffs' reliance on Hauter, observing that Hauter's discussion "of non-merchantability . . . rested upon the fact that the device was not fit for the ordinary purposes for which such goods are used because it had failed when used as a training device by a beginner golfer—the precise use contemplated for the product." Id. at 1297-98. Accordingly, the American Suzuki court concluded that "Hauter thus provides no support for the proposition that a remote fear or expectation of failure is sufficient to establish non-merchantability." Id. at 1298.

American Suzuki was on a procedural posture of an appeal following a granting of a class certification. Therefore, the court was able to note that "the evidence presented demonstrated that only a small percentage of the [vehicles] sold during the class period have been involved in rollover accidents, and real parties have impliedly conceded that nearly all of them have not." Id. Therefore, "[b]ecause the vast majority of the [vehicles] sold to the putative class 'did what they were supposed to do for as long as they were supposed to do it,'" the court concluded "that these vehicles remained fit for their ordinary purpose." Id. at 1298-99 (internal citation omitted). In light of this discussion, if this Court were to discern a rule from American Suzuki it would center on that court's language: remote fears or expectations of failure are insufficient to establish non-merchantability.

In contrast, the Court here has already determined that Plaintiffs have alleged an economic injury cognizable under Ninth Circuit precedent. Furthermore, the American Suzuki court had the benefit of the class certification record in order to determine whether the vast majority of vehicles sold actually 'did what they were supposed to do for as long as they were supposed to do it.' On a motion to dismiss, the Court is limited to the complaint and documents subject to judicial notice and incorporation. On that score, Plaintiffs have alleged that in addition to the Valisure study that they have conducted further testing of Walmart's BPO products that contained benzene in excess of 2 ppm. (ECF No. 66, ¶ 104.) In this regard, Plaintiffs here have alleged more than a remote fear

or expectation that the BPO products would contain benzene.

Walmart's other precedent is distinguishable. In Gagetta v. Walmart, Inc., the district court was stuck by the fact that the plaintiffs had "not alleged facts showing that that the products failed to 'conform[ ] to the standard performance of like products used in the trade.'" 646 F. Supp. 3d 1164, (N.D. Cal. 2022), quoting Viggiano v. Hansen Natural Corp., 944 F. Supp. 2d 877, 896 (C.D. Cal. 2013). Here, Plaintiffs have provided ample factual allegations on how benzene in excess of 2 ppm would not conform to the standard performance of BPO products insofar as they would be misbranded and/or adulterated.

Finally, Walmart cites to Keegan v. American Honda Motor Co., Inc., 284 F.R.D. 504, 537 (C.D. Cal. 2012), which the Court observes relied upon Hicks v. Kaufman and Broad Home Corp., from the California Court of Appeal—another case on a posture of an appeal following a denial of class certification. 89 Cal. App. 4th 908, 107 Cal. Rptr. 2d 761 (Cal. Ct. App. 2001). In Hicks, the court concluded that "proof of breach of warranty does not require proof the product has malfunctioned but only that it contains an inherent defect which is substantially certain to result in malfunction during the useful life of the product. The question whether an inherently defective product is presently functioning as warranted goes to the remedy for the breach, not proof of the breach itself." Id. at 918.

The Court finds that Hicks, if anything, supports Plaintiffs' claims here. Under Hicks, Plaintiffs need not allege that in fact their products contained benzene, but that BPO degrades with "substantial certainty" into benzene. Walmart seemingly takes the curious position that even still its BPO products might still be used for acne treatment. But even if BPO degraded into a non-carcinogenic byproduct, the Court finds that this would in and of itself degrade the efficacy of the purported BPO percentage of the product. In other words, if the active ingredient is prone to break down, the resulting product would be less efficacious for its intended use. Walmart's arguments regarding "Valisure's purported 'testing' and its methodology of super-heating BPO products and Plaintiffs vague and conclusory allegations of violations of cGMP regulations" are better suited for class certification or summary judgment.

A final word. The Court finds it telling that many of the cases where the California Court

of Appeal has discussed this issue arise on a posture of a motion to certify class. With such a motion, there is evidence for a court to determine whether products individually or as a whole are fit for their intended purpose, informing whether a claim for implied breach of warranty would be appropriate. Again, this is a motion to dismiss, where the Court must accept the factual allegations as true and view them in the light most favorable to Plaintiffs. Nothing here would prevent Walmart from later attacking this claim either on class certification or subsequent dispositive motion practice.

With these observations, the Court finds that Plaintiffs have sufficiently alleged a breach of implied warranty claim.[9]

**F. State Claim: Negligent Misrepresentation**

Walmart argues that the economic loss doctrine bars recovery under Plaintiffs' claims for negligent representation. (ECF No. 69-1, p. 20.) Plaintiffs argue that they seek damages based on Walmart's misrepresentations and omissions, which allegedly induced Plaintiffs into believing Walmart's products were legal OTC drugs, sold in compliance with relevant laws. Thus, Plaintiffs direct the Court to an exception involving fraudulent inducement. On this, the Court agrees with Walmart.

"The economic loss rule requires a purchaser to recover in contract for purely economic loss due to disappointed expectations, unless he can demonstrate harm above and beyond a broken contractual promise." Robinson Helicopter Co. v. Dana Corp., 34 Cal. 4th 979, 988, 102 P.3d 268 (Cal. 2004). The purpose of the economic loss rule is to ensure that a plaintiff relies "on the law of contracts and implied and express warranties to recover damage to the product sold, rather than resort to tort law." Bret Harte Union High Sch. Dist. v. FieldTurf, USA, Inc., No. 1:16-cv-00371-DAD-SMS, 2016 WL 3519294, at *4 (E.D. Cal. June 27, 2016). "When applied to product liability

[9] In a footnote, Walmart notes that Non-California Plaintiffs do not have standing to bring implied warranty claims on behalf of citizens of California. (ECF No. 69-1, p. 19 n.14.) Walmart then states "[a]nd to the extent Non-California Plaintiffs purport to bring implied warranty claims under the laws of states other than California, those claims must also be dismissed." (Id.) Such a substantial assertion and relief requested is not well-taken in a drive-by footnote. Furthermore, Plaintiffs have alleged which states they bring such claims under—namely, California, Hawaii, Maryland, Massachusetts, Michigan, Minnesota, Missouri, Nevada, New Jersey, Pennsylvania, and Rhode Island. (ECF No. 66, p. 85.) Whether and to what extent a class members may represent which classes is a question seemingly better suited for class certification.

suits, one may still sue for damage to property other than the product under the economic loss rule, but losses to the allegedly defective product itself are barred as 'economic' losses." Id.

In its reply, Walmart notes that the fraudulent inducement exception applies to only *intentional* fraud, not negligent misrepresentation. Indeed, the cases cited by Plaintiffs only support this assertion. See In re Chicago Flood Litig., 176 Ill. 2d 179, 198-99 (1997); Peguero v. Toyota Motor Sales, USA, Inc., No. 2:20-cv-05889, 2021 WL 2910562, at *12 (C.D. Cal. Apr. 26, 2021) (applying Texas law); Lee v. Fed. St. L.A., LLC, No. 2:14-cv-06264, 2016 WL 2354835, at *8 (C.D. Cal. May 3, 2016); Weisblum v. Prophase Labs, Inc., 88 F. Supp. 3d 283, 297 (S.D.N.Y. 2015) ("Courts applying both New York and California law have allowed intentional misrepresentation claims to proceed, notwithstanding the economic loss rule.").

Therefore, it appears that the economic loss doctrine bars recovery of a claim of negligent misrepresentation. The Court will recommend granting this aspect of Walmart's motion to dismiss. Amendment on this claim is seemingly futile, so the Court will recommend not giving leave to amend.

**G. State Claim: Unjust Enrichment**

Walmart argues that Plaintiffs' unjust enrichment claims seek an additional remedy for the same conduct that underlies Plaintiffs' other claims. Thus, Walmart contends "[b]ecause this claim is premised on the same factual basis as their other claims, it should be dismissed." (ECF No. 69-1, p. 21.) Yet, the caselaw Walmart has provided states, at times, the opposite.

In applying Illinois law, the Seventh Circuit in Cleary reasoned that "if an unjust enrichment claim rests on the same improper conduct alleged in another claim, then the unjust enrichment claim will be tied to this related claim—and, of course, unjust enrichment will stand or fall with the related claim." Cleary v. Philip Morris Inc., 656 F.3d 511, 517 (7th Cir. 2011) (applying Illinois law). In other words, both claims could proceed but if a predicate claim to the unjust enrichment claim failed, so too did the unjust enrichment claim.

In Hennessey v. Gap, Inc., the plaintiff conceded that "the actual values of the products were equal to the prices she paid." 2022 WL 4447399, at *8 (E.D. Mo. Sept. 23, 2022), aff'd, 86 F.4th 823, 831 (8th Cir. 2023). Thus, the Hennessey court, in applying Missouri law, concluded that

"[n]othing in the Complaint supports a finding that it would be inequitable for Defendants to retain the money Plaintiff paid for the products she purchased." Id.

Likewise, in Robie v. Trader Joe's Co., the court found, in applying California law, that the plaintiff's claim for unjust enrichment rose and fell with her other statutory claims that the court previously determined did not state a claim. 2021 WL 2548960, at *7 (N.D. Cal. June 14, 2021). Thus, the Robie court concluded that the unjust enrichment claim must be dismissed. Id. The Robie court did note that part of the unjust enrichment claim was "duplicative" to the plaintiff's other claims, but the court clearly referenced that aspect insofar as holding that the unjust enrichment claim failed for the same reasons, not that the claim was dismissed for mere duplicity in and of itself. See id. As should be apparent, none of these cases seem to support Walmart's broad contention that an unjust enrichment claim is necessarily barred when the same conduct underlies other claims.

That said, Walmart has cited to precedent which demonstrates that in New York "[a]n unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract or tort claim." Duchimaza v. Niagara Bottling, LLC, 619 F. Supp. 3d 395, 419 (S.D.N.Y. 2022), quoting Corsello v. Verizon N.Y., Inc., 18 N.Y.3d 777, 790, 944 N.Y.S.2d 732 (2012). Because Plaintiffs explicitly seek an unjust enrichment claim under New York law, (ECF No. 66, ¶ 302), this claim must be dismissed because New York does not recognize an unjust enrichment claim where it simply duplicates, or replaces, a conventional contract or tort claim. Corsello, 18 N.Y.3d at 790.

Therefore, the Court will recommend granting this aspect of Walmart's motion to dismiss as to a claim of unjust enrichment under New York law. Amendment on this claim also appears to be futile, so the Court will recommend not giving leave to amend. Walmart has not otherwise demonstrated how Plaintiffs' other unjust enrichment claims fail.

## VI.

## CONCLUSION AND RECOMMENDATION

Based on the foregoing, IT IS HEREBY RECOMMENDED that Defendant's motion to dismiss (ECF No. 69) be GRANTED IN PART and DENIED IN PART as follows:

1. Defendant's motion to dismiss as to Plaintiffs' claims of (a) negligent misrepresentation generally and (b) unjust enrichment under New York law be GRANTED without leave to amend; and

2. Defendant's motion to dismiss otherwise be DENIED.

These findings and recommendations are submitted to the district judge assigned to this action, pursuant to 28 U.S.C. § 636(b)(1)(B) and this Court's Local Rule 304. **Within fourteen (14) days** of service of this recommendation, any party may file written objections to these findings and recommendations with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."

Absent leave of the Court, any objections shall not exceed **twenty (20) pages** and, absent good cause and leave of the Court, shall be limited to arguments previously presented by the parties or ruled upon by the Court, and shall not cite any new authority which could have been cited at the time of the filing.

The district judge will review the magistrate judge's findings and recommendations pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal. Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014), citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991).

IT IS SO ORDERED.

Dated: **August 13, 2026**

STANLEY A. BOONE
United States Magistrate Judge